**2015 UT App 199**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Plaintiff and Appellee,
*v.*
MANUEL ANTONIO LUJAN,
Defendant and Appellant.

Memorandum Decision
No. 20131166-CA
Filed August 6, 2015

Third District Court, Salt Lake Department
The Honorable Randall N. Skanchy
No. 121910892

Nathalie S. Skibine and Lisa J. Remal, Attorneys
for Appellant

Sean D. Reyes and Kris C. Leonard, Attorneys
for Appellee

JUDGE GREGORY K. ORME authored this Memorandum Decision,
in which JUDGE KATE A. TOOMEY concurred. JUDGE JOHN A.
PEARCE dissented, with opinion.

ORME, Judge:

¶1    Defendant Manuel Antonio Lujan appeals his conviction of aggravated robbery, a first degree felony under section 76-6-302 of the Utah Code. Because we determine that the trial court erroneously admitted unreliable eyewitness testimony, we reverse and remand for a new trial.

¶2    Early one November morning, a man could not sleep, so he got out of bed and went outside. He decided to get his car ready for an upcoming safety inspection. It was while the man was seated inside his car in his driveway that he came face-to-face with a robber. The man described the robber as "Spanish"

and as wearing a black leather jacket and beanie. The robber had black and white "longish hair," which was straight and poked out of the beanie to "mid-ear length." The man "definitely" remembered the robber's hair.

¶3 The robber opened the man's driver-side door, squatted next to the seat, and asked the man, "Why you following me?" The robber stood, and the man saw him reach for what appeared to be the handle of a gun or a knife. The man was afraid he might be stabbed or shot. Wanting to return to the safety of his house, the man stood, nearly touching the robber, who was about his same height. He slowly worked his way around the robber and around the car and ran to his house. The robber drove off in the man's car, and the man told his brother to call the police, which he did. Officers soon arrived.

¶4 The man's car had a fluid leak, and officers were able to follow a trail of fluid and recover the abandoned car a few blocks away, near an elementary school. A K9 unit was called, and the dog appeared to "pick[] up on a track of the person that they [were] looking for" at the walkway gate of the school. The dog pulled the officers through the gate and toward "some portable or relocatable classrooms." At that point, some officers "kind of split" from the K9 unit, and one of those officers had a "gut feeling" to check an air conditioning unit outside the school, even though the dog was focused elsewhere. Officers found Defendant inside the air conditioning unit, and he told them "something like somebody is following me, somebody is out to get me."

¶5 Defendant is Hispanic, and he had closely-shaven hair and a goatee when the police found him. He was wearing a black beanie. Officers also testified that he was wearing a black jacket, but no jacket appeared in Defendant's booking photo, was listed on the jail property list, or was produced at trial.

¶6 Police contacted the man whose car had been stolen and told him that they had a suspect. They brought the man to the

school and asked if he could identify Defendant, who stood handcuffed in the dark, the only non-officer present, illuminated by the headlights of police cars. The man identified Defendant as the robber.

¶7 After being arrested and charged, Defendant requested a lineup, which the trial court granted. At the lineup, the man was unable to positively identify anyone as the robber. He did indicate that Defendant and another man looked familiar, but he was unsure whether either was the robber.

¶8 At the preliminary hearing, the man was asked to identify the robber, and he pointed to Defendant. As Defendant observes, he "was the only defendant sitting at counsel table and the only realistic choice."

¶9 Defendant moved to exclude evidence of the show-up and in-court identifications. The motion was denied, Defendant was convicted as charged, and he now appeals. The sole issue raised on appeal is whether the trial court erred when it denied Defendant's motion to suppress the identifications. We conclude that it did.

¶10 In *State v. Ramirez*, 817 P.2d 774 (Utah 1991), the Utah Supreme Court revised and clarified the protocol for courts to use in analyzing the admissibility of eyewitness identifications.[1]

---

1. We decide this case within the framework established by *State v. Ramirez*, 817 P.2d 774 (Utah 1991). We have every reason to believe, however, that *Ramirez* must be revisited. *See* Anne E. Whitehead, Note, State v. Ramirez*: Strengthening Utah's Standard for Admitting Eyewitness Identification Evidence*, 1992 Utah L. Rev. 647, 689 (1992) (generally approving of *Ramirez* but recognizing that it "is not without flaws" because "the court's conclusion seems incongruous with the results of its application of the reliability analysis, leaving uncertain the future impact of the new Utah analytical framework"). Aside from any flaws

(continued…)

(…continued)

inherent in the *Ramirez* analysis, scientific and legal research regarding the reliability of eyewitness identifications has progressed significantly in the last twenty-four years. *See generally* National Research Council of the National Academies, *Identifying the Culprit: Assessing Eyewitness Identification* 11–12 (2014).

Before *Ramirez*, the Utah Supreme Court first took an in-depth look at the potential shortcomings of eyewitness identifications in *State v. Long*, 721 P.2d 483 (Utah 1986). In *Long*, the Court accepted the invitation to "either abandon any pretext of requiring a cautionary eyewitness instruction or make the requirement meaningful" by deciding "to follow the latter course." *Id.* at 487. The Court did this by "abandon[ing its] discretionary approach to cautionary jury instructions and direct[ing] that in cases tried from th[at] date forward, trial courts shall give such an instruction whenever eyewitness identification is a central issue in a case and such an instruction is requested by the defense." *Id.* at 492.

Then, after *Ramirez*, the Court considered another aspect of cases involving eyewitness identifications—expert testimony. In *State v. Butterfield*, 2001 UT 59, 27 P.3d 1133, the Court affirmed a trial court's exclusion of an expert witness because the trial court had found that the proposed expert testimony "did not deal with the specific facts from [that] case but rather would constitute a lecture to the jury about how it should judge the evidence." *Id.* ¶ 44 (internal quotation marks omitted). The issue was revisited in *State v. Hubbard*, 2002 UT 45, ¶ 14, 48 P.3d 953. In *Hubbard*, while leaving *Butterfield* untouched, the Court did invite trial courts "to specifically tailor instructions other than those offered in *Long* that address the deficiencies inherent in eyewitness identification." *Id.* ¶ 20.

But in *State v. Clopten*, 2009 UT 84, 223 P.3d 1103, the Court recognized that its "previous holdings ha[d] created a de facto presumption against the admission of eyewitness expert testimony, despite persuasive research that such testimony is the

(continued…)

*See id.* at 779, 781–82. The Utah Supreme Court indicated that such clarification was necessary because "the scientific literature . . . 'is replete with empirical studies documenting the unreliability of eyewitness identification.'" *Id.* at 779 (quoting *State v. Long*, 721 P.2d 483, 488 (Utah 1986)). This led the Court "to comment that '[p]erhaps it is precisely because jurors do not appreciate the fallibility of eyewitness testimony that they give such testimony great weight.'" *Id.* at 780 (alteration in original) (quoting *Long*, 721 P.2d at 490). Thus, Utah applies a more stringent standard in making reliability determinations than that employed in the federal system. *Id.* at 784. *Compare Neil v. Biggers*, 409 U.S. 188, 199–200 (1972) (indicating that "the factors to be considered in evaluating the likelihood of misidentification

---

(…continued)
most effective way to educate juries about the possibility of mistaken identification." *Id.* ¶ 30. The Court sought to change this by announcing "that the testimony of a qualified expert regarding factors that have been shown to contribute to inaccurate eyewitness identifications should be admitted whenever it meets the requirements of rule 702 of the Utah Rules of Evidence." *Id.* The Court "expect[ed] this application of rule 702 [to] result in the liberal and routine admission of eyewitness expert testimony." *Id.*

While Utah jurisprudence now better recognizes the problematic nature of eyewitness identification, *Ramirez* remains the standard by which courts must evaluate the admissibility of this evidence. It is a standard that does not accurately reflect the changed views about handling this problematic evidence. And the disconnect between the legal analysis in *Ramirez* and its outcome makes it an unreliable tool for resolving particular cases, as shown by the two opinions in this case. All of this, taken together, indicates that it is time for our Supreme Court to reconsider *Ramirez*, a proposition with which the dissent agrees. *See infra* ¶ 21.

include the opportunity of the witness to view the criminal at the time of the crime, the witness'[s] degree of attention, the accuracy of the witness'[s] prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation"), *and Stovall v. Denno*, 388 U.S. 293, 302 (1967) (focusing on whether an eyewitness confrontation was "so unnecessarily suggestive and conducive to irreparable mistaken identification that [defendant] was denied due process of law"), *with Ramirez*, 817 P.2d at 781 (listing factors that are "generally comparable to the *Biggers* factors" but "more precisely define the focus of the relevant inquiry," and identifying the "ultimate question to be determined [as] whether, under the totality of the circumstances, the identification was reliable").

¶11 In *Ramirez*, the Court set forth five factors that must be considered when analyzing the reliability of an eyewitness identification: (1) opportunity to view, (2) degree of attention, (3) capacity to observe, (4) spontaneity and consistency, and (5) nature of the event. *Ramirez*, 817 P.2d at 781. The first factor, the opportunity of the witness to view the actor during the event, includes (but is not limited to) considering the length of time the witness viewed the actor, the distance between the witness and the actor, whether the witness could view the actor's face, the lighting or lack of it, and whether there were distracting noises or activity during the observation. *Id.* at 782. The second factor considers the witness's degree of attention to the actor. *Id.* at 781, 783. The third factor, whether the witness had the capacity to observe the actor during the event, includes considering whether the witness's capacity to observe was impaired by stress or fright, personal motivations, biases, prejudices, uncorrected visual defects, fatigue, injury, drugs, or alcohol. *Id.* at 783. The next factor, whether the witness's identification was made spontaneously and remained consistent thereafter or whether it was a product of suggestion, includes considering the length of time that passed between the witness's observation at the time of the event and the identification of the defendant, the witness's mental capacity and state of mind at the time of the

identification, the witness's exposure to information from other sources, instances when the witness failed to identify the defendant, instances when the witness gave descriptions that were inconsistent with the defendant, and the circumstances under which the defendant was presented to the witness for identification. *Id.* And the final factor, the nature of the event and the likelihood that the witness would perceive, remember, and relate it correctly, includes considering whether the event was an ordinary one in the mind of the witness and whether the race of the actor was the same as the witness. *Id.* at 781.

¶12    The *Ramirez* court considered the first four factors in detail and concluded that it was "an extremely close case." *Id.* at 784. The Supreme Court was particularly troubled by the "blatant suggestiveness of the showup," where Ramirez was identified in a very similar fashion to the way Defendant was here—Ramirez "was the only person at the showup who was not a police officer," he "stood with his hands cuffed," and the "headlights of several police cars were trained on him." *Id.* The Court was also concerned with the "differences in racial characteristics between" the eyewitness and Ramirez. *Id.* The Court determined, however, that "because the identification was based principally on the eyes, physical size, and clothing, these racial factors may have been of relatively little importance." *Id.*

¶13    The same factors that led the Supreme Court to conclude that *Ramirez* was "an extremely close case" are present here. *See id.* The show-up was conducted in almost identical fashion. Furthermore, the man who identified Defendant is Native American and Defendant is Hispanic. But unlike in *Ramirez*, the identification was not confined to the eyes, physical size, and clothing of Defendant. Instead, the State makes a point of the fact that the robber's entire, unobscured "face was about ten inches from" the man's when the robber first crouched down next to the car. Thus "racial factors" are more significant here than they were in *Ramirez. Cf. id.* at 776, 784 (noting that "racial factors may have been of relatively little importance" when eyewitness identification was based on the defendant's eyes, physical size,

and clothing, and the eyewitness did not have the opportunity to view the defendant's entire face).

¶14   This case also presents additional indications of unreliability. For instance, the man failed to identify Defendant at the lineup, which is an important consideration under the fourth *Ramirez* factor. *See id.* at 783. Moreover, the man's original description of the robber omitted any mention of facial hair and included a definite recollection of long, straight hair. In contrast, Defendant had a goatee and a shaved head, both of which are features that seem hard to miss at a distance of ten inches, and the man did not miss the shaved head because it was covered with a beanie—he "definitely" remembered hair protruding well below the beanie.

¶15   If *Ramirez* was an extremely close call, we are confident that here we can "say that [the man]'s testimony is legally insufficient when considered in light of the other circumstances to warrant a preliminary finding of reliability and, therefore, admissibility." *See id.* at 784. But our inquiry does not end there. We must also consider whether Defendant suffered prejudice as a result of the trial court admitting the identifications.

¶16   We agree with Defendant that the State bears the burden of convincing us that the improperly admitted eyewitness identifications were harmless beyond a reasonable doubt. *See Chapman v. California*, 386 U.S. 18, 24 (1967) ("[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt.").[2] The State has not met this burden.

---

2. We recognize that *State v. Ramirez*, 817 P.2d 774 (Utah 1991), was primarily concerned with an alleged due process violation under the Utah Constitution. *Id.* at 781. *See* Utah Const. art. I, § 7. Utah's approach "is certainly as stringent as, if not more stringent than, the federal analysis," but there is no reason to

(continued…)

¶17    For us to determine that the trial court's error was harmless beyond a reasonable doubt, we must consider "the importance of the witness'[s] testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence co[rro]borating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *State v. Villarreal*, 889 P.2d 419, 425–26 (Utah 1995) (citation and internal quotation marks omitted). When the man's identifications of Defendant are removed, the State's case is severely weakened.

¶18    Evidence supporting the State's case includes the facts that Defendant was wearing a beanie and a jacket when found and that he is Hispanic, which jurors might conclude matched the man's description of a "Spanish" robber. The State recognizes that its strongest piece of evidence, aside from the eyewitness identifications, albeit with their significant descriptive discrepancies, was Defendant's comment to police about someone following him—a comment similar to the question posed by the robber to the man, "Why you following me?" But without the identifications, the jurors would likely have found very significant the man's initial description of the robber—a description that lacked a goatee and included long black and white hair—and the evidence that a trained police dog following the suspect's scent pulled officers toward portable classrooms at the elementary school, while other officers veered off from the K9 unit and later found Defendant curled up in an air conditioning unit.

---

(…continued)
assume our constitution would impose a different standard of review for those few circumstances where our constitution is violated but the federal constitution is not. *Ramirez*, 817 P.2d at 784. *See* U.S. Const. amend. XIV, § 1.

¶19    When the eyewitness testimony is taken away, the State loses its strongest evidence against Defendant, and we cannot say that the trial court's error in admitting the unreliable eyewitness identifications was harmless beyond a reasonable doubt. We accordingly vacate Defendant's conviction and remand for a new trial.

———————

PEARCE, Judge (dissenting):

¶20    I dissent.

¶21    I agree with the majority that the time may have arrived for the Utah Supreme Court to revisit its holding in *State v. Ramirez*, 817 P.2d 774 (Utah 1991). But so long as *Ramirez* remains good law, we are duty-bound to apply it. I cannot squint at *Ramirez*'s holding in a way that permits me to see how the identification testimony offered in this case is less reliable than the testimony the *Ramirez* court deemed admissible. *Ramirez* identified five factors a court must consider in assessing the reliability of eyewitness testimony. In almost all respects, the showup involving Defendant in this case was substantially less troublesome than that the *Ramirez* court approved.

¶22    The first *Ramirez* factor centers on the "opportunity of the witness to view the actor during the event." *Id.* at 782. This includes consideration of how long the witness saw the actor, the distance between them, the lighting, whether the witness could view the actor's face, and whether there were distracting circumstances that would affect the witness's ability to see the actor. *Id.*

¶23    In *Ramirez*, the witness (Wilson) testified at various times that he had seen the actor for either a second, a few seconds, or a minute or longer. Wilson also testified that the actor was about ten feet away from him; other witnesses described the distance as being as much as thirty feet away. Wilson testified that the

actor was crouched at the end of a building and was wearing a mask over the lower part of his face. Wilson conceded that he could not see the actor's eyes clearly, but he "could see enough to know" they were "small." *Id.* Testimony varied as to whether the lighting was good or whether shadows shrouded the actor. *Id.* at 782–83.

¶24 Here, the trial court found that the witness viewed Defendant for several seconds when they were face to face in the car's open doorway. They were less than a foot apart, and the area was lit by two street lamps, a porch light, a neighbor's floodlight, and the car's headlights, as well as the car's overhead dome light and lighted dashboard. Defendant's face was uncovered. In all relevant ways, with the possible exception of the duration of the observation, the witness's opportunity to view Defendant was superior to the observation *Ramirez* considered.

¶25 The second *Ramirez* factor examines the witness's degree of attention to the actor. *Id.* at 783. In *Ramirez*, Wilson was accosted by two men: Ramirez, who wielded a firearm, and a second man carrying a pipe. Wilson was struck with the pipe before he was even aware of Ramirez. While Wilson became aware of Ramirez's presence, the "pipe man" continued to threaten and swing the pipe at Wilson. In contrast, here, the witness was alone with Defendant. After observing Defendant for several seconds, the witness thought that the way Defendant moved his hand was suggestive of having a weapon. The witness began to get out of the car and negotiate his way around Defendant to escape the situation. Although concern over the potential possession of a weapon by Defendant may have distracted the witness, it remains a far cry from the distractions Wilson faced.

¶26 The third *Ramirez* factor looks at the witness's capacity to observe the event, including "whether the witness's capacity to observe was impaired by stress or fright at the time of the observation, by personal motivations, biases, or prejudices, by

uncorrected visual defects, or by fatigue, injury, drugs or alcohol." *State v. Ramirez*, 817 P.2d 774, 783 (Utah 1991). The *Ramirez* court considered that Wilson had been struck by a pipe and was facing a gun pointed at him by a masked man while the assailant continued to swing the pipe and threaten him. The supreme court concluded that "it was reasonable to assume that Wilson experienced a heightened degree of stress." *Id.* Although the witness here was undoubtedly startled by the presence of a stranger in his car at 3:30 a.m., there was no evidence before the trial court that this impaired the witness's capacity to observe Defendant. Nor was there any evidence that injury, drugs, or alcohol may have impaired the witness.

¶27 The fourth *Ramirez* factor considers whether the witness's identification was made spontaneously and remained consistent. *Id.* It also examines whether the identification was the "product of suggestion." *Id. Ramirez* instructs that trial courts should consider a variety of factors, including the amount of time between observation and identification, the witness's mental capacity and state of mind at the time of the identification, the witness's exposure to information from other sources, instances when the witness failed to identify the defendant, instances when the witness gave inconsistencies in the description of the defendant, and the circumstances under which the defendant was presented to the witness for identification. *See id.*

¶28 In *Ramirez*, the showup occurred less than an hour after the event and the court concluded that nothing in the record suggested that Wilson's mental capacity or state of mind influenced the identification. Wilson was aware that one of the other witnesses had not identified Ramirez as the gunman but was otherwise not exposed to other identifications or opinions. The supreme court noted that Wilson's descriptions had varied in some details, such as whether Ramirez had worn a hat or sported tattoos. *Id.* at 784.

¶29 In this matter, the showup took place thirty-five minutes after the robbery. There is no indication in the record that the

witness had been influenced by additional information. However, as the majority ably describes, there exist a number of concerns with the consistency of the witness's descriptions of Defendant. Notably, at a subsequent lineup, the witness identified both Defendant and another man as persons who might have stolen his car. Moreover, the witness originally omitted any mention of Defendant's facial hair and said that the robber had long, straight hair. Defendant had a goatee and was bald. The discrepancies in the witness's identification present the only way in which this matter could be considered a better candidate for reversal than *Ramirez*. However, in light of the myriad other ways in which the testimony in *Ramirez* appears more unreliable than that at issue here, I cannot conclude that these discrepancies are enough to pull this case from *Ramirez*'s reach.

¶30    *Ramirez* also examined whether Wilson's identification of Ramirez was the product of suggestion by looking at the procedures the showup employed. The identification occurred at night. *Id.* Prior to the showup, police officers remarked to Wilson that they had apprehended someone who fit the description of one of the robbers. Ramirez, the only person involved in the showup who was not a police officer, was handcuffed to a chain-link fence illuminated by the headlamps of police cars. Wilson identified Ramirez from the back seat of a police vehicle. Here, Defendant was similarly cuffed and lit by headlights. Defendant was also the only person at the showup who was not a law enforcement officer.

¶31    I concur with the majority when it echoes the *Ramirez* court's conclusion that "[t]he blatant suggestiveness of the showup is troublesome." 817 P.2d 774, 784 (Utah 1991). However, even after acknowledging the troublesome nature of the showup, as well as Wilson's inability to see Ramirez's face (in part because Ramirez was wearing a mask), Wilson's changing testimony about whether Ramirez wore a hat, and the distraction caused by another assailant wielding a pipe, the *Ramirez* court found that Wilson's identification testimony was

sufficiently reliable to be admissible. *Id.* at 782–84. Although it is far from the most satisfying result, if the testimony Wilson offered in *Ramirez* cleared the bar, so too must the testimony the witness offered in this matter.

¶32    For these reasons, I dissent.

————————