**2016 UT App 172**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
ISAAC ANTHONY GALLEGOS,
Appellant.

Opinion
No. 20140571-CA
Filed August 11, 2016

Third District Court, Salt Lake Department
The Honorable Elizabeth A. Hruby-Mills
No. 121911467

Nathalie S. Skibine and Samuel J. Hanseen,
Attorneys for Appellant

Sean D. Reyes and Marian Decker, Attorneys
for Appellee

JUDGE J. FREDERIC VOROS JR. authored this Opinion, in which
JUDGE GREGORY K. ORME and SENIOR JUDGE RUSSELL W. BENCH
CONCURRED.[1]

VOROS, Judge:

¶1    Isaac Anthony Gallegos appeals his convictions for murder, aggravated assault, and obstruction of justice stemming from two stabbings—one fatal—outside a Salt Lake City club in 2012. Gallegos contends that the trial court erred in two ways: first, by admitting unreliable eyewitness identification testimony from one witness; and second, by refusing to declare a mistrial

---

1. Senior Judge Russell W. Bench sat by special assignment as authorized by law. *See generally* Utah R. Jud. Admin. 11-201(6).

after a prosecution witness alluded to Gallegos's alleged gang ties. We affirm.

BACKGROUND

¶2      On a snowy November night in 2012, two people—a club patron and a club bouncer—were stabbed outside a Salt Lake City club during a parking lot brawl. The patron died at the scene. The bouncer (Bouncer) survived.

¶3      Earlier that evening, a group of four patrons—the murder victim (Victim) and three others—went to the club. A few hours later, as the four prepared to leave, Gallegos, his girlfriend, and another couple arrived, and their ID's were scanned at the door. Inside the club, Gallegos was introduced to one of the four patrons (Patron) as "Smokey, from 18th Street." The two "exchanged words" and Gallegos hit Patron. A scuffle ensued just inside the club's front doors. A club manager (Manager) alerted security. Club security apparently quelled the fight, but it soon moved outside.

¶4      In the parking lot, the fight escalated into a brawl with a crowd of people fighting on the ground. Bouncer began pulling people off the pile surrounding Victim. A man then approached Bouncer from behind and stabbed him at least twice. The man also stabbed Victim. Bouncer survived, but Victim died at the scene.

¶5      After the brawl, police arrived and investigated. Four witnesses described the stabber as a bald Hispanic man with short facial hair. A fifth witness described the stabber as a bald man with a goatee. One of those witnesses, Patron, told police that the stabber was introduced as "Smokey, from 18th Street" earlier that night. A police database check for the moniker "Smokey" returned Gallegos's name and address.

¶6      Later that night, police began surveilling Gallegos's apartment. Outside his apartment, tire tracks in the snow led to a

parked brown or copper Chevy truck with its engine still warm. Footprints from the truck led to Gallegos's door. At about 1 a.m., two children left Gallegos's apartment and carried two garbage bags to a nearby dumpster. The bags contained a torn long-sleeve dress shirt with a small blood stain, a white undershirt, and a small knife blade without its handle. The blood on the shirt was Gallegos's own. The knife tested negative for blood. Gallegos was charged with murder, aggravated assault, and obstruction of justice.

*Manager's Eyewitness Testimony*

¶7    Gallegos challenges Manager's identification of Gallegos as the stabber. Manager testified that while attempting to break up the melee he saw one of the men "trying to work toward" Bouncer. The man "reached into his pocket and he pull[ed] out a knife." The knife appeared to be a double-sided "black knife" with a two-and-a-half to three-inch blade. Watching "the guy with the knife," Manager saw the man "start[] stabbing [Bouncer]," "three, maybe four times." Manager did not "know if he connected on every single swing" but testified that the stabber "definitely hit [Bouncer]." In response, Bouncer initially "just shoved [the stabber] off like it was nothing" before realizing he had been stabbed.

¶8    At this point Victim lay beneath a "dog pile" on the ground. Manager testified that after the stabber struck Bouncer, the stabber got on top of Victim and repeatedly stabbed him, "between eight and ten times." The stabber swung so many times, Manager testified, that "all I saw was a blur." Another bouncer (Employee) pulled the stabber off of Victim, but could not hold him. Manager testified that the stabber ended up "looking straight at [him]" from only "a few feet away." Still looking at the stabber, Manager told the stabber to "just leave." The stabber and two other men ran to a truck and drove away. Manager initially described the truck to police as a "big Ford four-door truck" but later described the vehicle as a "reddish brown" Chevy truck.

¶9    Manager testified that he had a clear view of the stabber's face because the fight occurred near the club's illuminated awning. Manager described the stabber as an average-size, bald, Hispanic man about 30 years old with short, light facial hair. And he described the stabber as "wearing a white T-shirt" covered by a light "brownish" long-sleeve dress shirt.

¶10    As a former bouncer, Manager was trained to "memorize what [a perpetrator] look[s] like" and "memorize if there is anything that stands out, clothing, facial hair, tattoos," when something serious happens. Manager explained that bouncers do this "so if police or any kind of liability-type issues were to come up, bouncers would know the details." Although Manager admitted that he had watched the news the day after the incident and heard that the police had arrested a suspect, he did not "remember a picture."

¶11    Approximately 30 days after the stabbings, Manager was shown a photo array by the lead detective on the case. Another officer had assembled the physical photographs, but the detective knew which photo showed the suspect. The photo array itself consisted of an instruction sheet and a stack of six black-and-white photos: one photo of Gallegos, and five "filler photos" of other men who shared Gallegos's birth year and physical characteristics—bald or with very short hair and facial hair. Although the detective later testified that the photos were limited to "the exact same age, within the same ethnicity of the [suspect]," two of the men did not have Hispanic surnames and the parties disagree about the exact ethnicity of each person. The suspects appear to have similar skin tones. The selection criteria for the photo array stated "white male."[2]

---

2. "Based on the definitions created by the Office of Management and Budget and the U.S. Census Bureau, the concepts of race and ethnicity are mutually independent, and respondents to the census and other Census Bureau surveys are asked to answer both questions. Hispanicity is independent and thus not the

(continued…)

¶12 The detective conducted the photo array at the police station. He began the procedure by handing Manager the instruction sheet and asking him to read it; the sheet contained four instructions:

> You are about to be shown a group of photographs. Before you view these photographs, please read the following carefully.
>   1) Because a police officer is showing you a group of photographs, this should not influence your judgment in any way.
>   2) The person who committed the crime may or may not be in the group of photographs.
>   3) You are in no way obligated to identify anyone.
>   4) Study each photograph carefully before making any comments. Consider that the photographs could be old or new, that hair styles change, and that persons can alter their identity by growing or shaving facial hair.

¶13 The detective testified that he made no comments or gestures while Manager read the instructions. After Manager finished reading the instruction sheet, he signed his name to it. Next, the detective handed Manager a stack of six black-and-

---

(…continued)

same as race, and constitutes an ethnicity category, as opposed to a racial category, the only one of which that is officially collated by the U.S. Census Bureau. For the Census Bureau, *Ethnicity* distinguishes between those who report ancestral origins in Spain or Hispanic America (Hispanic and Latino Americans), and those who do not (Non-Hispanic Americans)." *See* White Hispanic and Latino Americans, https://en.wikipedia.org/wiki/White_Hispanic_and_Latino_Americans (emphasis in original) [https://perma.cc/Z9AQ-QLSC].

white photographs; Gallegos's photo was third in the stack. Although each photo was printed on a page of the same physical dimensions, the size of Gallegos's photo was smaller than the others Also, each photo included a URL, but the URL on Gallegos's photo was different from the URL that appeared on the other photos. No one told Manager the names of the men in the photo array.

¶14   Due to a dead battery, the video recorder did not record the comments made at the photo array. However, the detective testified that Manager "essentially went through [the photos] one at a time." After viewing each photo, Manager handed Gallegos's photo to the detective and stated, "This is him." The detective asked Manager "how positive he was"; Manager responded, "A hundred percent positive and I will testify."

*Other Eyewitness Testimony*

¶15   Although only Manager testified to seeing both stabbings, five other witnesses testified to seeing one or the other of the stabbings. A club promoter (Promoter) and Patron witnessed Victim's stabbing, and Bouncer, Bouncer's brother (Brother), and Employee witnessed Bouncer's stabbing. Gallegos does not challenge their testimony, but we outline it in some detail because it bears on the question of prejudice.

¶16   First, Promoter testified that he arrived at the club as the bouncers were moving the brawlers outside. Promoter testified that a man who looked "really pissed off" walked by him while a woman tried to grab the man's arm, saying, "no, no, no don't." Promoter then saw this same man make "jabbing motions" towards Victim's chest. Promoter was standing four feet away and had a profile view of the man and Victim. When Victim fell to the ground bleeding, Promoter realized that the man had stabbed Victim. Promoter attempted to restrain him, but the stabber took off running.

¶17   Later that night, Promoter described the stabber as a bald Hispanic man. He identified Gallegos as the stabber from a

police photo array. Promoter also identified Gallegos as the stabber from a photo of Gallegos taken shortly before Gallegos's visit to the club.

¶18   Second, Patron testified that while he was at the club, a man, introduced earlier as "Smokey," hit him. During the scuffle, Patron also saw "Smokey" hitting Victim. Patron described "Smokey" as a bald Hispanic man with facial hair. Following the brawl, Patron picked Gallegos from the same police photo array shown to Manager. However, Patron could not identify Gallegos at trial.

¶19   Third, Brother, also a bouncer, was working at the club on the night of the stabbings. Brother testified that, while taking a break at the club's front entrance, he saw a dark red or burgundy Chevy truck pull up. Brother spoke to the driver, a bald Hispanic man wearing a white long-sleeve shirt, and held the door for the driver and his female companion as they entered the club. During the brawl, Brother saw the same bald Hispanic man run up behind Bouncer and hit him in the side with his right hand. Brother later testified he remembered the fight but his memory of the night was "rusty." Brother did not participate in any photo array or in-trial identification and was not asked to identify the stabber at trial.

¶20   Fourth, Employee testified that he saw a group of three men and two women enter the club. One member of the group, a bald man with a goatee, took off his long-sleeve shirt, exposing a tank top. Employee asked the man to put his shirt back on, and the man complied. But before he did, Employee noticed the man's tattoos on his shoulders and arms. About fifteen minutes later, Employee heard breaking glass and saw "a huge fight" near where the bald man's group had been sitting earlier. Employee, Bouncer, and the other bouncers followed the combatants outside. Standing behind Bouncer, Employee saw the bald man step between them and make a "forward motion" toward Bouncer. Employee "went on instinct and just grabbed" the man, but the man slipped away. In a police photo array that

night and at trial, Employee identified Gallegos as the bald man who stabbed Bouncer. Further, after viewing a shirtless photo of Gallegos which showed his tattoos, Employee confirmed that the photo matched the appearance of the man that Employee had asked to put his shirt back on at the club—the same man Employee identified as the stabber.

¶21    Fifth, Bouncer described his own stabbing. As Bouncer pulled combatants off the heap, he looked behind him and saw a bald Hispanic man approach, lunge forward, and hit him on his lower right side. Bouncer initially "just shoved [the stabber] off like it was nothing," but after lifting up his shirt, touching the wound, and seeing his hand covered in blood, Bouncer realized he had been stabbed. Bouncer could not identify Gallegos as his stabber at the preliminary hearing but did identify Gallegos as his stabber at trial.

*Trial*

¶22    Gallegos was charged with murder, aggravated assault, and obstruction of justice. Before trial, he moved to suppress Manager's photo array identification, but the court denied the motion. The trial court stated that although the photo array was "perhaps not done in what is the ideal situation," it did not violate Gallegos's rights. At a preliminary hearing and again at trial, Manager pointed out Gallegos, who was sitting in the courtroom, as the stabber. Manager also identified Gallegos in a photo taken before Gallegos went to the club that night.

¶23    At trial, Gallegos called an expert to testify about eyewitness identification. She testified that several different factors, including time, stress, weapon-focus, lighting, and race, can affect eyewitness identifications. She testified that the photo array met many of the National Institute of Justice standards for photo arrays, including the presence of "at least five" filler photos, a warning "that the perpetrator may or may not be" in the photo array, and a statement that the suspect's appearance may have changed. But other aspects of the identification procedure concerned the expert, such as the lack of a double-

blind procedure—the detective presenting the array knew that Gallegos was a suspect. Other factors which concerned the expert included the comparatively smaller size of Gallegos's photo within the same-sized page and the different URL listed beneath it. She also testified that an alternative explanation of Manager's positive identification of Gallegos might be that Manager saw Gallegos at the club that night (unrelated to the stabbings) or saw Gallegos's picture in media coverage following the stabbings.

¶24 The police sergeant who surveilled Gallegos's house after the stabbings also testified at trial. Before he took the stand, the parties agreed that he would not mention Gallegos's alleged gang ties. However, in the course of testifying, the sergeant made three statements that could have suggested a connection between Gallegos and gang activity. First, he stated that his current assignment included investigating "crimes, violent street crimes, [and] gang crimes." Second, he testified that he learned of the stabbings when "he was called out from Kearns as a member of the gang unit." Third, he stated that he heard "that witnesses had observed, or had heard the suspect say: 'I'm Smokey from 18th street."

¶25 Following the sergeant's statements, Gallegos moved for a mistrial on the ground that the statements were unfairly prejudicial. The trial court denied the motion, stating that reference to any gang evidence "was de minimis" at most. The trial court offered to give a curative instruction, but cautioned that an instruction might draw attention to the challenged testimony. Gallegos declined the curative instruction.

¶26 The jury convicted Gallegos as charged.

ISSUES AND STANDARDS OF REVIEW

¶27 Gallegos asserts two claims of error on appeal. First, he contends that the trial court erred by denying his motion to suppress Manager's eyewitness identification. Whether a pretrial

photo array violates due process presents a question of law reviewed for correctness. *State v. Hubbard*, 2002 UT 45, ¶ 22, 48 P.3d 953 (citing *State v. Ramirez*, 817 P.2d 774, 781 (Utah 1991)). However, a challenge to a subsidiary factual determination presents a question of fact reviewed under the clearly erroneous standard. *Id.* We apply this dual standard of review to both the federal and state analyses. *Id*.

¶28 Second, Gallegos contends that the trial court erred by denying his motion for a mistrial after a police sergeant made gang-related references in his testimony. "A trial court's denial of a motion for a mistrial will not be reversed absent an abuse of discretion." *State v. Wach*, 2001 UT 35, ¶ 45, 24 P.3d 948.


ANALYSIS

I. Eyewitness Identification

¶29 Gallegos first contends that the trial court erred by admitting Manager's eyewitness identification testimony. Gallegos argues that under Utah's due process clause, Manager's identification was unreliable and was the product of suggestive State conduct—namely, the police photo array. Gallegos brings his challenge only under Utah's due process clause, not the federal due process clause. "[T]he Utah standard is both more rigorous and better suited to the facts of this case," Gallegos argues, because the Utah standard includes a single "totality of the circumstances" test more stringent than the two-step federal test.

¶30 The State responds that Manager's identification of Gallegos as the stabber was constitutionally reliable under both the federal and state due process standards. The State argues that "[n]either federal nor state due process is implicated absent suggestive State conduct." And here, according to the State, because the photo array given to Manager was not suggestive, his testimony was constitutionally reliable and thus admissible. Next, the State argues that even if the photo array was

arguably suggestive, it presented no substantial likelihood of misidentification. Finally, the State argues that Gallegos's challenge "fails for lack of prejudice."

¶31 The admissibility of eyewitness identification testimony is governed by the due process clauses of both the federal and Utah constitutions. *See Perry v. New Hampshire*, 132 S. Ct. 716, 720, 728–29 (2012); *State v. Ramirez*, 817 P.2d 774, 779 (Utah 1991). Gallegos does not argue that Manager's testimony violated the federal due process clause. He asserts that the admission of Manager's testimony violated only Utah's "more rigorous" standard. However, because an understanding of the federal standard aids our analysis under Utah's standard, we begin by examining the federal standard.

A.    Admissibility Under the Federal Due Process Clause

¶32 The Fourteenth Amendment to the United States Constitution provides "a due process check on the admission of eyewitness identification, applicable when the police have arranged suggestive circumstances leading [a] witness to identify a particular person as the perpetrator of a crime." *Perry*, 132 S. Ct. at 720. The federal model for the admissibility of eyewitness testimony has two steps.

¶33 At step one, the court determines whether the identification was the product of "unnecessarily suggestive" law enforcement procedures. *Id.* at 722; *see Neil v. Biggers*, 409 U.S. 188, 197–99 (1972). If "unnecessarily suggestive" identification procedures were not used, the due process inquiry ends. *Perry*, 132 S. Ct. at 720, 724–25. But if "unnecessarily suggestive" procedures were used, the court proceeds to step two. At step two, the court determines "whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." *Biggers*, 409 U.S. at 199. The court considers a variety of factors, "includ[ing] the opportunity of the witness to view the criminal at the time of the crime, the witness'[s] degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty

demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Id.* at 199–200.[3]

B.     Admissibility Under the Utah Due Process Clause

¶34     The due process clause of the Utah Constitution also limits admission of eyewitness identifications. *Ramirez*, 817 P.2d at 778 (citing Utah Const. art. I, § 7). In *State v. Ramirez*, our supreme court explained the standard Utah courts use to analyze the admissibility of eyewitness identifications. *Id.* at 779, 781–82; *see also State v. Lujan*, 2015 UT App 199, ¶ 10, 357 P.3d 20, *cert. granted*, 364 P.3d 48 (Utah 2015).[4] The prosecution bears the

---

3. We note, however, that the witness-certainty factor "has come under withering attack as not relevant to the reliability analysis. While acknowledging that under current law an eyewitness's level of certainty in his identification remains a relevant factor in assessing reliability, many courts question its usefulness in light of considerable research showing that an eyewitness's confidence and accuracy have little correlation." *United States v. Greene*, 704 F.3d 298, 309 n.4 (4th Cir. 2013) (collecting authorities).

4. *Lujan* contains a lengthy footnote in which this court explains that, while we decided the appeal "within the framework established by *State v. Ramirez*, 817 P.2d 774 (Utah 1991)," we "have every reason to believe . . . that *Ramirez* must be revisited." *State v. Lujan*, 2015 UT App 199, ¶ 10 n.1, 357 P.3d 20. We surveyed recent scientific literature discussing eyewitness identification credibility and the progression of Utah case law on the subject before concluding with a plea "for our Supreme Court to reconsider *Ramirez*"—a point with which *Lujan's* dissent agreed. Our supreme court granted certiorari. *See State v. Lujan*, 2015 UT App 199, ¶ 10, 357 P.3d 20, *cert. granted*, 364 P.3d 48 (Utah 2015). However, because *Ramirez* remains the standard by which we evaluate eyewitness identification evidence, *id.*, we apply it here.

burden of demonstrating the admissibility of eyewitness identification evidence. To satisfy this burden, the prosecution must "lay a foundation upon which the trial court can make any necessary preliminary factual findings and reach any necessary legal conclusions." *Ramirez*, 817 P.2d at 778. Next, the trial court must act "as gatekeeper" and "carefully scrutinize" the evidence for constitutional defects before admitting or excluding the evidence from the jury. *Id*.

¶35    Our supreme court has clarified that "[e]ven if law enforcement procedures are appropriate and do not violate due process, eyewitness identification testimony must still pass the gatekeeping function of the trial court and be subject to a preliminary determination—whether the identification is sufficiently reliable to be presented to the jury." *State v. Hubbard*, 2002 UT 45, ¶ 26, 48 P.3d 953. Thus, the single focus of a Utah trial court's constitutional admissibility analysis "is whether, under the totality of the circumstances, the identification was reliable." *Ramirez*, 817 P.2d at 781.

¶36    Gallegos argues that Utah's due process analysis for eyewitness identifications is thus "more rigorous" than the federal model. Specifically, Gallegos asserts that Utah's model does not contain a two-step approach like the federal model. Under the Utah approach, Gallegos maintains, suggestiveness is not a threshold consideration but merely one factor to be weighed in determining reliability.

¶37    The State responds that Utah's due process analysis requires a "conditional two-step analysis" similar to the federal model. According to the State, "*Ramirez* criticized the federal model, but did not eliminate—or take issue with—the conditional two-step federal approach." In the State's view, "*Ramirez* 'depart[ed] from federal case law only to the degree that . . . the federal analytical model [is] scientifically

unsupported.'" (quoting *Ramirez*, 817 P.2d at 780).[5] Thus, the State argues, an eyewitness identification does not violate state due process guarantees absent some unnecessarily suggestive police act.

¶38   The trial court did not treat the potential suggestiveness of the photo array as a threshold step, but instead as one of the five factors for assessing reliability introduced by *State v. Long*, 721 P.2d 483 (Utah 1986). After discussing each of the *Long* factors, the court ruled that Manager's identification of Gallegos as the stabber was constitutionally admissible.

¶39   We first determine if Utah's test for the admissibility of eyewitness evidence requires a preliminary finding of suggestibility similar to the federal approach.

   1.   Suggestive Police Conduct Is Not a Threshold Requirement in Utah.

¶40   *Ramirez* remains Utah's model for the constitutional admissibility of eyewitness identification testimony. And, as Justice Thomas Lee has noted, "*Ramirez* did not expressly establish police misconduct as a threshold requirement." *State v. Clopten*, 2015 UT 82, ¶ 73, 362 P.3d 1216 (Lee, A.C.J, concurring in part and concurring in the result) (urging adoption of police misconduct as a threshold requirement). And although the Utah Supreme Court "has never squarely addressed the question," it

---

5. Both parties assert that they prevail under either construction of the Utah model; Gallegos argues that, in any event, "the identification array procedure was suggestive," and the State argues that "even if the photo array was arguably suggestive, there was no substantial likelihood of irreparable misidentification." However, because we determine that Utah's model departs from the federal two-step model and does not require suggestive procedures as a threshold step, we do not discuss the parties' alternative arguments.

has applied the *Long* factors in "cases in which suggestive police activity is missing." *Id.* ¶¶ 73–74. For example, in *State v. Hubbard*, our supreme court cited *Ramirez* and stated, "Even if law enforcement procedures are appropriate and do not violate due process, eyewitness identification testimony must still pass the gatekeeping function of the trial court and be subject to a preliminary determination—whether the identification is sufficiently reliable to be presented to the jury." 2002 UT 45, ¶ 26, 48 P.3d 953. On this state of the law, we conclude that the Utah Constitution does not require police misconduct—improper suggestiveness—as a threshold requirement in eyewitness identification cases. Instead, the Utah standard focuses on a single "totality of the circumstances" determination for "reliability," using each of the five *Long* factors, as discussed in *State v. Ramirez*. *See* 817 P.2d 774, 781 (Utah 1991).

¶41  We next consider whether under the totality of the circumstances Manager's identification was reliable. *Id.* at 778.

    2.    Manager's Identification Was Reliable.

¶42  To analyze the reliability of an eyewitness identification, a trial court must consider the five factors originally outlined in *State v. Long*:

> (1) The opportunity of the witness to view the actor during the event; (2) the witness's degree of attention to the actor at the time of the event; (3) the witness's capacity to observe the event, including his or her physical and mental acuity; (4) whether the witness's identification was made spontaneously and remained consistent thereafter, or whether it was the product of suggestion; and (5) the nature of the event being observed and the likelihood that the witness would perceive, remember and relate it correctly. This last area includes such factors as whether the event was an ordinary one in the mind of the observer during

the time it was observed, and whether the race of the actor was the same as the observer's.

*Ramirez*, 817 P.2d at 781 (citing *Long*, 721 P.2d at 493).

These factors offer guidance concerning which considerations may bear on the reliability of an eyewitness identification. But they offer no guidance on how reliable an identification must be to pass constitutional scrutiny. The holding of *Ramirez* suggests the bar is not high.

¶43   In *Ramirez*, two robbers—both wearing white scarves across their faces—attacked a Pizza Hut employee, her husband, and her brother as they were leaving the store around 1 a.m. *Ramirez*, 817 P.2d at 776. The first robber hit the brother with a metal pipe, instructed the second robber to shoot the brother if he moved, and ordered the employee to retrieve a bank bag from the restaurant. *Id.* She retrieved the bag and gave it to the robbers, who fled. *Id.* The victims called police. They "described the robbers to the police, but the descriptions were somewhat conflicting." *Id.* Two officers ultimately detained Ramirez as a suspect. *Id.* at 777.

¶44   One of the three victims identified Ramirez under showup circumstances the supreme court described as "blatant[ly] suggestive[]," *id.* at 784:

It was approximately one o'clock in the morning. Ramirez, a dark-complexioned Apache Indian, was handcuffed to a chain link fence. He was the only suspect present and was surrounded by police officers. The police turned the headlights and spotlights from the police cars on Ramirez to provide enough light. The witnesses viewed Ramirez by looking at him from the back seat of a police car. Of the three witnesses, only [the employee's brother] identified Ramirez as the masked man with the gun; the other two witnesses

> were unable to identify him as one of the robbers. Following the identification, Ramirez was placed under arrest and was charged with the robbery.

*Id.* at 777. None of the witnesses, including the brother, were able to see his face during the robbery. *Id.* at 782. The brother identified Ramirez at the showup and at trial as the masked gunman. *Id.* at 777.

¶45    Ramirez contended that introducing the eyewitness identification violated his due process rights under the Utah Constitution. *Id.* at 778. After examining each of the *Long* factors, the *Ramirez* court found it "to be an extremely close case." *Id.* at 784. The court found the "blatant suggestiveness of the array" troubling. *Id.* But after "[c]onsidering the facts in the light most favorable to the trial court's decision and giving due deference to the trial judge's ability to appraise demeanor evidence," the court could not say that the challenged testimony was "legally insufficient when considered in light of the other circumstances to warrant a preliminary finding of reliability and, therefore, admissibility." *Id*.

¶46    The eyewitness identification here is by any measure at least as reliable as that in *Ramirez*. We view this eyewitness identification through the lens of the five *Long* factors, as discussed by *Ramirez*. Factor four addresses the witness's later identification of the suspect; the other factors address the witness's observation of the event.

¶47    "The first factor, to be considered in determining the reliability of the identification is the opportunity of the witness to view the actor during the event. Here, pertinent circumstances include the length of time the witness viewed the actor; the distance between the witness and the actor; whether the witness could view the actor's face; the lighting or lack of it; whether there were distracting noises or activity during the observation; and any other circumstances affecting the witness's opportunity to observe the actor." *Id.* at 782 (citing *State v. Long*, 721 P.2d 483, 493) (Utah 1986).

¶48    In this case, Manager testified that the fight lasted less than ten minutes. The fight occurred outside of the club at night and during a snow storm, but lights from the club's awning illuminated the area. After watching Gallegos stab both victims, Manager "looked straight at" Gallegos's uncovered face from only "a few feet away" and told him to "just leave." These facts indicate that Manager had an adequate opportunity to view the stabber during the melee.

¶49    The second factor considers "the witness's degree of attention to the actor at the time of the event." *Id.* at 783. Here, Manager stood a few feet behind the brawl and saw Gallegos stab both victims. Manager saw Gallegos hit Bouncer, then saw Gallegos get on top of Victim and stab him "between eight and ten times." After the stabbings, Gallegos looked "straight at" Manager. Part of Manager's training as a bouncer required him to "memorize what [a perpetrator] look[s] like" in order to aid later criminal investigations. And Manager testified that on the night in question, he was "focusing and memorizing what [the stabber] looked like." During the night's events, no one threatened or attacked Manager. These facts indicate that Manager paid close attention to the stabber's identity.

¶50    The third factor is "the witness's capacity to observe the event, including his or her physical and mental acuity." *Id.* at 781 (citing *Long*, 721 P.2d at 492). This factor "includes considering whether the witness's capacity to observe was impaired by stress or fright, personal motivations, biases, prejudices, uncorrected visual defects, fatigue, injury, drugs, or alcohol." *State v. Lujan*, 2015 UT App 199, ¶ 11, 357 P.3d 20, *cert. granted*, 364 P.3d 48 (Utah 2015).

¶51    No one attacked or threatened Manager during the fight. And although he described the situation as "traumatic," Manager's job duties routinely involved dealing with fights and aggressive patrons. On the night of the stabbings, Manager followed appropriate club protocol by separating the sparring groups. Manager was not under the influence of alcohol or drugs

when he witnessed the stabbings; there is no indication in the record the he was suffering from any visual defects or fatigue that night; and nothing in the record shows that Manager's capacity to observe the stabbings was impaired by any personal motivations, biases, or prejudices. These facts indicate that Manager had the physical and mental capacity to observe Gallegos during the brawl.

¶52    The fourth factor considers "whether the witness's identification was made spontaneously and remained consistent thereafter or whether it was a product of suggestion [and] includes considering the length of time that passed between the witness's observation at the time of the event and the identification of the defendant, the witness's mental capacity and state of mind at the time of the identification, the witness's exposure to information from other sources, instances when the witness failed to identify the defendant, instances when the witness gave descriptions that were inconsistent with the defendant, and the circumstances under which the defendant was presented to the witness for identification." *Lujan*, 2015 UT App 199, ¶ 11 (citing *Ramirez*, 817 P.2d at 783).

¶53    In this case, Manager identified Gallegos in a photo array 30 days after the incident. Manager arrived during the day and nothing in the record shows that he was fatigued, stressed, or under the influence of alcohol or drugs at the time. Manager testified that he watched the news the day after the stabbings and heard that police had arrested a suspect; however, he did not "remember a picture." The procedure was not "double-blind," meaning that the detective who administered the identification procedure knew which of the pictured men was the suspect. And the array was not recorded.

¶54    Manager was shown six black-and-white photos: one of Gallegos and five "filler photos" of other men who shared Gallegos's birth year and physical characteristics—bald or with very short hair and facial hair. The size of Gallegos's photo was smaller than the others and contained a different URL at the

bottom of the page. Gallegos also argues that three of the men were not Hispanic—Gallegos's ethnicity. Although all of the men had similar physical characteristics, Gallegos was completely bald whereas some of the other men had discernible hair. Manager went through all six photos before making his selection, rather than following a standardized sequential procedure which requires the eyewitness to respond "yes," "no," or "not sure" to each photo individually.

¶55   The photo array violated best practices in several ways: the size difference in the photos, the different URLs, the lack of a double blind procedure, the lack of a recording, and the delay between the events in question and the identification. However, we cannot say that this identification procedure was more suggestive than the identification procedure at issue in *Ramirez*.

¶56   In *Ramirez*, the three eyewitnesses were asked to identify a single suspect who was handcuffed to a chain link fence in the middle of the night, illuminated by police car headlights. The witnesses sat in the back of a police car. Police told the witnesses that they had located a suspect who matched the description of the robber the witnesses saw earlier that night. Only one of the three witnesses was able to identify the suspect as Ramirez. *See State v. Ramirez*, 817 P.2d 774, 783 (Utah 1991).

¶57   By contrast, here Manager identified Gallegos from a photo array conducted at the police station. The Manager was given six different options—rather than one—and told that the stabber may or may not be among the photos. Moreover, the "fillers" matched the witnesses' descriptions of the stabber as a man with bald or very short hair and short facial hair. Although Gallegos argues that three of the men were not of Hispanic origin, each of the men appeared to have similar skin tones. And the Utah Supreme Court has held "[t]he key" for eyewitness identification reliability "is whether the descriptions of the subjects in the photo array match the description of the suspect";

thus, "matching the subjects by skin tone [is] sufficient." *State v. Lopez*, 886 P.2d 1105, 1112 (Utah 1994).[6] Although we are troubled by the lack of a double-blind procedure and the fact that Gallegos's photograph was sized differently and listed a different URL than the others, we cannot say the photo array in this case was more suggestive than the one-man showup in *Ramirez*.

¶58 The fifth factor considers "the nature of the event being observed and the likelihood that the witness would perceive, remember, and relate it correctly." *Ramirez*, 817 P.2d at 781 (citing *State v. Long*, 721 P.2d 483, 493 (Utah 1986)). This factor includes considering "whether the event was an ordinary one in the mind of the observer during the time it was observed, and whether the race of the actor was the same as the observers." *Id.*

¶59 Manager is Polynesian, Gallegos is Hispanic. But Manager testified that he was trained to remember faces during emergency situations and that he employed this training on the night of the stabbings. That training, and Manager's conscious effort to remember the suspect's face on this occasion, suggest that Manager was likely to perceive, remember, and relate the stabbings to law enforcement.

¶60 Having considered Manager's identification of Gallegos under each of the five *Long* factors, we conclude that, though flawed in several ways, under a "totality of the circumstances, the identification procedure was reliable." *See id*. The trial court thus properly performed its gatekeeping function in admitting the evidence. We accordingly affirm on this ground.

---

6. *State v. Lopez* analyzed the suggestibility of a photo array under the federal due process clause. *See* 886 P.2d 1105, 1111–13. Because the state due process protocol also includes suggestibility, *Lopez* is instructive insofar as it analyzed a photo array's suggestibility. *See id.*

     3.     Admitting Manager's Eyewitness Identification Testimony Was Harmless Beyond a Reasonable Doubt.

¶61    Our holding that the trial court properly performed its gatekeeping role under *Ramirez* could end our analysis of this issue. However, in *Lujan,* we urged our supreme court to "reconsider *Ramirez,*" and indeed the court granted a writ of certiorari in that case. *See State v. Lujan*, 2015 UT App 199, ¶ 10 n.1, 357 P.3d 20, *cert. granted*, 364 P.3d 48 (Utah 2015). The standard for admissibility of eyewitness testimony may thus be clarified in the near future. Consequently, in the present case we continue our analysis to the question of harm. We conclude that, even if the trial court erred by admitting Manager's eyewitness identification testimony, we would nevertheless affirm on the ground that admitting Manager's testimony was harmless.

¶62    What standard of harm applies here, however, is unclear. Under the federal standard, "the State bears the burden of convincing us that the improperly admitted eyewitness identifications were harmless beyond a reasonable doubt." *Id.* ¶ 16; *see also Chapman v. California,* 386 U.S. 18, 24 (1967) ("[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt."). Whether an error is harmless beyond a reasonable doubt in a particular case depends on a host of factors, including "the importance of the witness'[s] testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986); *see also Lujan*, 2015 UT App 199 ¶ 17 (citing *State v. Villarreal*, 889 P.2d 419, 425–26 (Utah 1995)).

¶63    However, Gallegos contends that the trial court violated the state constitution, not the federal constitution. Utah courts have not determined whether the harmless-beyond-a-reasonable-

doubt standard applies to violations of the Utah Constitution. *See State v. Bell*, 770 P.2d 100, 106 n.12 (Utah 1988) ("[T]his Court has never squarely decided whether violations of the Utah Constitution must be addressed under the federal constitutional standard of 'harmless beyond a reasonable doubt.'"). We need not resolve that question here, because we conclude that admission of the challenged testimony was harmless even under the higher beyond-a-reasonable-doubt standard.

¶64  Gallegos argues that the State has not met its burden under this standard. Specifically, Gallegos asserts that the State has not refuted potentially exculpatory evidence: that no blood was detected on Gallegos's knife, that Gallegos's shirt only contained his own blood, and that another eyewitness saw Victim fighting with a man who did not look like Gallegos.

¶65  The State responds that because "five other witnesses saw one or the other of the two stabbings and three of the five—[Promoter], [Employee], and [Bouncer]—similarly identified [Gallegos] as the stabber at trial . . . even absent [Manager's] identification, . . . any error in the admission of [Manager's] identification here was harmless."

¶66  The State's response is convincing. Even without Manager's eyewitness identification testimony, the evidence that Gallegos stabbed the victims allowed for no reasonable doubt. Three witnesses (Brother, Employee, and Bouncer) saw Gallegos stab Bouncer; two witnesses (Promoter and Patron) saw Gallegos stab Victim; and three witnesses (Promoter, Employee, and Bouncer) identified Gallegos as the stabber at trial. Four of the five witnesses (Promoter, Patron, Brother, and Bouncer) described the stabber as a bald Hispanic man, and the fifth (Employee) described the stabber a bald man with a goatee. These descriptions match Gallegos. Moreover, the truck observed at Gallegos's apartment after the stabbings matched Brother's descriptions of Gallegos's truck as "dark red or burgundy" and was consistent with the club's surveillance video showing a Chevy truck entering and exiting the parking lot that

night. Furthermore, although the shirt Gallegos threw away that night tested positive only for Gallegos's own blood, those bloodstains suggest Gallegos's involvement in a bloody fight. And the shirt's light color and collared style matched the description of the stabber's clothing given by Employee, Bouncer, and Brother.

¶67    Ultimately, because the eyewitness testimony from five other witnesses and other physical evidence admitted at trial all pointed to Gallegos as the stabber, the admission of Manager's eyewitness testimony was harmless beyond a reasonable doubt.

## II. Gang References

¶68    Gallegos also contends that "[t]he [trial] court erred when it denied his motion for a mistrial after the introduction of highly prejudicial gang evidence."

¶69    The trial court admitted the police sergeant's responses to three questions at trial: what his current assignment was, where he was when dispatch called for help after the stabbing, and if he identified a suspect that night. Despite an agreement "not to say anything about" Gallegos's alleged gang involvement, the sergeant responded to each of the questions as follows: that he investigated "crimes, violent street crimes, [and] gang crimes," that he responded to the club because "they were requesting members of the Metro Gang Unit to respond," and that he heard "that witnesses had observed, or had heard the suspect say: 'I'm Smokey from 18th Street . . . .'"

¶70    The trial court denied Gallegos's request for a mistrial, ruling that reference to any gang evidence "was de minimis" at most. The trial court offered to give Gallegos a curative instruction, but cautioned that an instruction might actually draw attention to the comments.

¶71    The State argues that Gallegos cannot prove a substantial likelihood that he would have been acquitted absent the statements, that the responses were unprompted and made in

passing, and that the fact that Gallegos's trial counsel chose to forgo a curative instruction shows that the sergeant's comments did not require a mistrial.

¶72   "A trial court's denial of a motion for a mistrial will not be reversed absent an abuse of discretion." *State v. Wach*, 2001 UT 35, ¶ 45, 24 P.3d 948. "Unless the record clearly shows that the trial court's decision 'is plainly wrong in that the incident so likely influenced the jury that the defendant cannot be said to have had a fair trial, we will not find that the court's decision was an abuse of discretion.'" *State v. Butterfield*, 2001 UT 59, ¶ 46, 27 P.3d 1133 (quoting *State v. Robertson*, 932 P.2d 1219, 1231 (Utah 1997)).

¶73   First, only two of the sergeant's three statements necessarily referred to gangs. The sergeant stated that he was told "the suspect sa[id]: 'I'm Smokey from 18th Street,'" but it is not obvious that jurors would know that the term "18th Street" referred to the "18th Street Gang" rather than a physical location. As for the sergeant's other two statements, both were made in passing by the witness and not elicited by the prosecutor. The court offered to give a curative instruction, but Gallegos's trial counsel declined. Further, these comments connected the officer, but not necessarily Gallegos, to gang activity.

¶74   Because the jury heard ample evidence of Gallegos's guilt, we cannot say that the admission of two passing comments referencing Gallegos's alleged gang ties "so likely influenced the jury that [Gallegos] cannot be said to have had a fair trial." *See id.* (quoting *State v. Robertson*, 932 P.2d 1219, 1231 (Utah 1997)). Hence, we affirm the trial court's denial of Gallegos's motion for a mistrial.

CONCLUSION

¶75   We conclude that the admission of Manager's eyewitness identification was proper under *State v. Ramirez*. But even if it was not, the admission was harmless beyond a reasonable

doubt. We also conclude that the trial court did not abuse its discretion in refusing to declare a mistrial after a prosecution witness alluded to Gallegos's alleged gang ties at trial. The judgment of the trial court is affirmed.

———