2017 UT App 87

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
JUSTIN PAUL CRAFT,
Appellant.

Opinion
No. 20150750-CA
Filed May 25, 2017

Third District Court, Salt Lake Department
The Honorable Paul B. Parker
No. 131902555

Teresa L. Welch, Attorney for Appellant

Sean D. Reyes and Jennifer Paisner Williams,
Attorneys for Appellee

JUDGE STEPHEN L. ROTH authored this Opinion, in which JUDGES
KATE A. TOOMEY and DAVID N. MORTENSEN concurred.

ROTH, Judge:

¶1 Justin Paul Craft appeals his convictions for aggravated robbery and aggravated burglary, both first degree felonies. *See* Utah Code Ann. §§ 76-6-203, -302 (LexisNexis 2012). While we reject Craft's claim that the eyewitness identifications were unreliable, we ultimately vacate Craft's convictions and remand for a new trial based upon trial counsel's ineffective assistance in failing to move for a mistrial due to a detective's statement that codefendants had placed Craft at the scene of the crime.

BACKGROUND

¶2     On March 12, 2013, at around 2:00 a.m., a man (the witness) was awakened in his bedroom by two men in ski masks "punching [him] in the face . . . with guns pointing at [his] head." During this assault, he was also pistol-whipped. The assault left "his whole face . . . bloody."

¶3     Around the same time, the witness's mother, who was also in the house, woke to a flashlight shining in her eyes and a man pointing a gun at her. This man also wore a mask.

¶4     After the two men searched the witness's room, they took him into a living area and held him there at gunpoint. He was ordered to stay on his knees with his head down and his "hands over [his] head." The men began searching the living area, closets, and bathrooms. While the witness was in the living area, the third man brought the witness's mother into the same room at gunpoint and ordered her to kneel facedown as well.

¶5     At some point, one of the men removed his mask. The witness could see the man in his "peripheral vision." Ambient light from one of the closets lit the living area. According to the witness's mother, "there was enough light that the whole room was very well visible to the eye." The witness later described the man who removed his mask as being "white, with reddish-brown hair and a goatee."

¶6     After the witness had been in the living room for about "five to ten minutes," the men left the house, taking with them cellphones, the witness's wallet, an iPad, two laptops, golf clubs, and two sets of car keys. The witness and his mother stayed on the floor for about a minute after the men left before going to a neighbor's house to call the police.

¶7     When the police arrived, they were able to track some of the witness's electronic devices to a trailer park. Soon after

arriving at the park, the officers saw two individuals run toward the trailers. The officers ordered the individuals to stop, but they ran into a trailer. The officers waited outside until backup arrived and then ordered everyone out of the trailer one at a time. Craft was one of the people in the trailer. In a vehicle behind the trailer, police found several of the stolen items as well as a mask and a gun. The seven individuals from the trailer were taken to the police station and interviewed. After speaking with each of them, police arrested Craft and two other people.

¶8 A detective interviewed the witness approximately seven to eight hours after the robbery. During the interview, the detective showed the witness a color photo lineup, or photo array, that included Craft's photograph as well as the photographs of five other men who resembled Craft. The detective displayed the photos one at a time and gave the witness a chance to review each one. When the witness indicated that Craft looked familiar to him, the detective asked, "[W]as that the guy standing by your bed?" The witness confirmed that it was.

¶9 Craft and the other two arrested individuals were prosecuted for the robbery. The trial court granted a motion to sever Craft's case from that of his codefendants so incriminating admissions by the codefendants could not be used against him.

¶10 At trial, the State's primary evidence consisted of the witness's testimony and a phone call made by Craft to an unidentified woman while he was in jail. An officer who reviewed the call testified that the woman was giving Craft "a hard time" and telling him that he "messed up." Craft responded, "I know," and stated, "I'm probably going to do a nickel." In the portion of the call played for the jury, Craft stated, "I guess my homeboys . . . are a little crazy man. . . . I told 'em to leave all the electronics, 'don't . . . touch nothing like that.' 'Leave it.'" Following the State's presentation of evidence, defense counsel moved for a directed verdict, which the court denied.

¶11    In his defense, Craft called an expert witness on eyewitness identification, Dr. David Dodd. Dodd testified generally about the reliability of eyewitness identifications. He testified that an eyewitness's ability to acquire a memory may be compromised by several factors, including the limited time to view the assailant; stress and fright at the time of the assault; and distractions, such as being threatened by a weapon and having multiple assailants to focus on. He testified that, in his opinion, the witness in this case was in a sufficiently stressful, frightening situation to disrupt his "mental processes." Dodd also testified about an eyewitness's ability to retain memory. He explained that memory fades over time and emphasized the importance of making a report of the observations soon after the events. He noted that, in this case, the witness's initial description of the suspect "was very limited"—that, for example, the description failed to give "any idea . . . what the age of the perpetrator was." He also explained that memory retention can be affected by subtle suggestion that might take place, such as in the wording of questions during police interviews.

¶12    Dodd also suggested that the photo lineup procedure did not fully conform to the National Institute of Justice's recommended practices for conducting photo lineups. *See* U.S. Dep't of Justice, Eyewitness Evidence: A Guide for Law Enforcement 29–38 (1999), *available at* https://www.ncjrs.gov/pdffiles1/nij/178240.pdf [https://perma.cc/TK3E-6XD4]. Specifically, he indicated that the officer conducting the lineup did not tell the witness "that the perpetrator may or may not be in the lineup" and that the investigation would continue regardless of whether the witness made an identification; that detailed interviews and reports were not made immediately after the crime was reported; and that the officer did not ask the witness about his degree of certainty after the witness identified Craft. Dodd also suggested that the best practice for the lineup would have been a double-blind procedure, that is, one in which the officer conducting the lineup is unaware of which photo is

the suspect. Nevertheless, Dodd acknowledged that the use of a sequential photo lineup was appropriate and that the photographs chosen for their resemblance to Craft were "reasonable."

¶13   At one point during trial when the State was questioning the detective about how he selected the photos for the lineup, the following exchange took place:

> Q. Okay. And the defense counsel mentioned hair, goatee and white skin as the characteristics discussed with [the witness] during his description before the lineup, correct?
>
> A. Yes.
>
> Q. Aside from those, are there any other factors other than just the similarity to the defendant that guided you in selecting the lineup photographs?
>
> A. *As far as the other two defendants saying he was there.*
>
> Q. No. Let me—the—when you were picking the photographs out—
>
> A. Oh.

(Emphasis added.) Defense counsel did not object to the detective's statement that Craft's codefendants said he was there.

¶14   Following the two-day trial, the jury found Craft guilty of both aggravated robbery and aggravated burglary. The court sentenced him to an indeterminate prison term of not less than ten years to life for each count, with the sentences running concurrently. Craft appeals his convictions.

ISSUES AND STANDARD OF REVIEW

¶15    Craft argues that he received ineffective assistance of counsel because his counsel did not challenge the admissibility of the eyewitness testimony or move for a mistrial based on the detective's statement that Craft's codefendants had said he was at the scene of the crime.[1] "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *Layton City v. Carr*, 2014 UT App 227, ¶ 6, 336 P.3d 587 (brackets, citation, and internal quotation marks omitted).

ANALYSIS

¶16    To demonstrate that his counsel performed ineffectively, Craft "must first demonstrate that counsel's performance was deficient, in that it fell below an objective standard of reasonable professional judgment." *State v. Litherland*, 2000 UT 76, ¶ 19, 12 P.3d 92 (citing *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984)). "Second, [he] must show that counsel's deficient performance was prejudicial—i.e., that it affected the outcome of the case." *Id.* (citing *Strickland*, 466 U.S. at 687–88). In demonstrating that counsel's performance was deficient, Craft must "rebut the strong presumption that 'under the circumstances, the challenged action might be considered sound

---

1. Craft also asserts that the evidence was insufficient to support his convictions. Our determination that the eyewitness testimony was admissible under *State v. Ramirez*, 817 P.2d 774 (Utah 1991), *see infra* ¶¶ 17–22, essentially resolves this issue. The witness's testimony, placing Craft at the scene of the crime, as apparently believed by the jury, provided sufficient evidence of Craft's guilt.

trial strategy.'" *Id.* (quoting *Strickland*, 466 U.S. at 689) (additional internal quotation marks omitted).

### I. Counsel Did Not Perform Deficiently by Failing to Seek Exclusion of the Eyewitness Testimony.

¶17    The standard under Utah law for determining whether eyewitness testimony is admissible is set forth in *State v. Ramirez*, 817 P.2d 774 (Utah 1991). In that case, our supreme court outlined a number of factors courts should consider in determining whether an eyewitness identification is "sufficiently reliable that its admission and consideration by the jury will not deny the defendant due process," with the "ultimate question" being "whether, under the totality of the circumstances, the identification was reliable." *Id.* at 779, 781. These factors include

> (1) the opportunity of the witness to view the actor during the event; (2) the witness's degree of attention to the actor at the time of the event; (3) the witness's capacity to observe the event, including his or her physical and mental acuity; (4) whether the witness's identification was made spontaneously and remained consistent thereafter, or whether it was the product of suggestion; and (5) the nature of the event being observed and the likelihood that the witness would perceive, remember and relate it correctly. This last area includes such factors as whether the event was an ordinary one in the mind of the observer during the time it was observed, and whether the race of the actor was the same as the observer's.

*Id.* at 781 (alteration omitted) (quoting *State v. Long*, 721 P.2d 483, 493 (Utah 1986)).

¶18    Because Craft challenges his convictions on the ground of ineffective assistance of counsel, we are not directly tasked with

determining whether the eyewitness testimony was admissible. However, the admissibility of the evidence must inform our determination of whether counsel performed deficiently in not seeking to have it excluded.

¶19   Recently, this court expressed the view "that *Ramirez* must be revisited" in light of "scientific and legal research" conducted in the years since that case. *State v. Lujan*, 2015 UT App 199, ¶ 10 n.1, 357 P.3d 20, *cert. granted*, 364 P.3d 48 (Utah 2015); *accord State v. Gallegos*, 2016 UT App 172, ¶ 34 n.4, 380 P.3d 44; *see also State v. Clopten*, 2009 UT 84, ¶¶ 15–16, 30, 223 P.3d 1103 (expanding the admissibility of expert testimony regarding eyewitness identification in light of "[d]ecades of study" establishing "that eyewitnesses are prone to identifying the wrong person as the perpetrator of a crime, particularly when certain factors are present"). However, "*Ramirez* remains the standard by which we evaluate eyewitness identification evidence," and we must evaluate counsel's performance in light of that standard. *See Gallegos*, 2016 UT App 172, ¶ 34 n.4.

¶20   In *Ramirez*, the eyewitness viewed the perpetrator for somewhere between "a few seconds" and "a minute or longer" from a distance of ten to thirty feet. 817 P.2d at 782 (internal quotation marks omitted). The perpetrator was "wearing a mask over the lower part of his face," so the eyewitness could describe only his eyes, his size, and his clothing. *Id.* at 782–84. The eyewitness's attention was split between two assailants at the time he viewed the perpetrator, but he had good eyesight; was not impaired by fatigue, injury, drugs or alcohol; and made an effort to look closely at the perpetrator. *Id.* at 783. The eyewitness identified the defendant at a showup between thirty minutes and an hour after the crime took place. *Id.* He viewed the defendant from the back seat of a police car while the defendant was handcuffed to a chain link fence. *Id.* at 784. The defendant "was the only person at the showup who was not a police officer." *Id.* While our supreme court considered "[t]he blatant suggestiveness of the showup" to be "troublesome," and while

the troublesomeness was "compounded" because the witness never saw "the full face of the gunman," the court ultimately determined that the identification was sufficiently reliable to be admissible. *Id.*

¶21 Whether the eyewitness testimony was reliable under the circumstances of this case certainly presents a close question. The witness's ability to view the suspect was limited because the living area was lit only by ambient light from a storage closet, the witness was forced to keep his head down so that he was able to observe the suspect only in his "peripheral vision," and his vision may have been obstructed by blood in his eyes. Further, the witness's attention was split between three assailants, and he was injured by the assault and under significant stress during the time he observed them. Approximately seven to eight hours passed between the time the witness observed the suspect and the time he identified Craft, and there were shortcomings in the way the photo lineup was conducted. On the other hand, the witness had approximately five to ten minutes to observe the suspect, and Dodd testified approvingly of the detective's "selection of . . . foils" for the lineup and his use of a "sequential procedure" to show the photos. In addition, although the witness's description of the assailant after the events was not detailed, it was generally consistent with Craft's appearance.

¶22 In evaluating the admissibility of eyewitness evidence,

> [c]ourts need not, nor should they, step into the province of the jury and decide the ultimate matter of identification for the jurors. Courts must simply decide whether the testimony was sufficiently reliable so as not to offend [a] defendant's right to due process by permitting clearly unreliable identification testimony before the jury.

*State v. Hubbard*, 2002 UT 45, ¶ 30, 48 P.3d 953. While there were significant areas of concern regarding the eyewitness testimony, the testimony was sufficiently reliable to pass constitutional muster under the *Ramirez* standard. *See id.* The photo lineup in particular, though not flawless, was significantly less concerning than the blatantly suggestive showup in *Ramirez*. Though the witness had only a peripheral view, the assailant here was not masked. *See Ramirez*, 817 P.2d at 784. In light of *Ramirez* and its continuing authority on the issue of eyewitness identification, it would not have been unreasonable for counsel to determine that attempting to discredit the testimony at trial was a better strategy than pursuing a likely futile motion to exclude the testimony. Indeed, as we concluded in *State v. Mecham*, 2000 UT App 247, 9 P.3d 777, deciding to forgo a motion to suppress (that would have been unlikely to succeed) in order to avoid an evidentiary hearing that would give the "identification witnesses yet another chance to rehearse their testimony and further solidify their identifications" of the defendant seems much more likely to be "a product of sound tactics rather than of ignorance or ineptitude." *Id.* ¶¶ 15–16, 26. Thus, we are not persuaded that Craft's counsel performed deficiently in forgoing such a motion.[2]

## II. Counsel's Failure to Seek a Mistrial Based on the Detective's Improper Statement Constituted Ineffective Assistance of Counsel.

¶23   Craft next asserts that his counsel performed deficiently by failing to object to and move for a mistrial based on the detective's statement indicating that Craft's codefendants told him Craft was at the crime scene. We agree with Craft that this failure rose to the level of ineffective assistance of counsel and requires that his convictions be vacated.

---

2. Craft also challenges the witness's in-court identification of him, but he does not analyze it separately from the out-of-court identification.

¶24 "[A]n incident rises to the level requiring a mistrial" if the trial court determines that the "incident may have or probably influenced the jury, to the prejudice of [the defendant]." *State v. Cardall*, 1999 UT 51, ¶ 18, 982 P.2d 79 (second alteration in original) (emphasis, citation, and internal quotation marks omitted). Under Utah law, an improper statement does not require a mistrial where it "is not intentionally elicited, is made in passing, and is relatively innocuous in light of all the testimony presented." *State v. Allen*, 2005 UT 11, ¶ 40, 108 P.3d 730; *see also, e.g.*, *State v. Butterfield*, 2001 UT 59, ¶¶ 45–47, 27 P.3d 1133 (concluding that a witness's reference to the defendant's criminal history was innocuous where significant additional evidence of the defendant's guilt was presented in the case); *State v. Wach*, 2001 UT 35, ¶¶ 44–46, 24 P.3d 948 (concluding that a victim's improper remark that she wore a security alarm when she was around the defendant was innocuous "given the totality of the evidence against" the defendant, which included the victim's testimony regarding his violence toward her); *State v. Milligan*, 2012 UT App 47, ¶¶ 8–9, 287 P.3d 1 (concluding that a witness's improper statement that the defendant's tattoo indicated that he had committed murder was not likely to have influenced the verdict because there was substantial additional testimony of the defendant's guilt, including testimony from multiple eyewitnesses, forensic evidence, and the defendant's admissions).

¶25 The State concedes that the detective's statement in this case was improper but asserts that the statement was innocuous because it was made out of context when the officer was being questioned about the photo lineup; the prosecutor quickly moved on by clarifying the question he intended to ask; and the prosecutor did not mention the statement again or attempt to use it in support of the State's case. Thus, the State asserts that it was unlikely that the trial court would have granted a mistrial even if counsel had requested it and it was therefore reasonable for trial counsel to have remained silent to avoid highlighting

the improper testimony further. While we acknowledge that the improper statement in this case was not intentionally elicited and was made in passing, we are not convinced that it was "innocuous in light of all the testimony presented." *See Allen*, 2005 UT 11, ¶ 40.

¶26   Craft's entire defense was based on his assertion that he was not present at the scene of the crime. The trial court had previously granted a motion to sever so that Craft's case could be tried separately from those of his codefendants. Severance was requested and granted for the very purpose of avoiding the introduction in Craft's case of incriminating statements made by his codefendants. And the statement here did not involve a peripheral issue, such as the defendant's criminal history or prior bad acts, *cf. Butterfield*, 2001 UT 59, ¶¶ 45–47; *Wach*, 2001 UT 35, ¶¶ 44–46, but pertained to the heart of the central factual issue the jury was tasked with resolving—whether Craft was the man the witness saw in his house on the night of the crime, *cf. State v. Larrabee*, 2013 UT 70, ¶ 36, 321 P.3d 1136 (holding that where the primary issue in the case was the defendant's credibility and no other evidence was presented to undermine it, a prosecutor's improper references to excluded credibility evidence were "highly prejudicial" because "they went to the heart of what the jury was being asked to decide").

¶27   Given the significance of the improper statement in the context of the defense, we think it likely that the incident "may have or probably influenced the jury, to the prejudice of" Craft. *See Cardall*, 1999 UT 51, ¶ 18 (emphasis, citation, and internal quotation marks omitted). If the jury believed the detective's statement, it could have ignored all the other less definitive and more contested evidence, *see infra* ¶¶ 29–32, and relied on this one improper statement to resolve the primary question of whether Craft participated in the crime. It was therefore likely that a mistrial would have been granted had counsel objected to the statement, and we can conceive of no strategic basis for counsel to have neglected to move for one. *Cf. Larrabee*, 2013 UT

70, ¶¶ 28–32 (acknowledging that "[t]he question of where to draw the line—of when to object and when to stand pat—is . . . difficult," but cautioning that courts should not "too readily accept[]" the argument that it is sound trial strategy to stay silent "based on a 'fear of highlighting'" a prejudicial comment, because doing so has the potential to "significantly undermine our ineffective assistance of counsel doctrine" (first alteration in original) (citation and additional internal quotation marks omitted)).

¶28 Further, we agree with Craft that his counsel's failure to move for a mistrial was prejudicial. To demonstrate prejudice, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 694 (1984). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

¶29 The limitations of the evidence in this case make it reasonably probable that the detective's statement placing Craft at the scene of the crime influenced the verdict. *Cf. State v. Milligan*, 2012 UT App 47, ¶¶ 8–9, 287 P.3d 1. Although we have ultimately determined that the witness's testimony was sufficiently reliable under *Ramirez* to be admissible, *see supra* ¶¶ 17–22, it was certainly not strong enough to make a guilty verdict a foregone conclusion. As we have explained, the witness's description of his assailant was not very detailed. The witness did not have a direct view of his assailant's face, the room was dim, he had recently been assaulted, and he had blood in his eyes. Furthermore, Dodd's testimony highlighted the various limitations of eyewitness testimony under the circumstances and also described deficiencies in the photo lineup that could have influenced the jury's view of the reliability of the eyewitness identification.

¶30 The other evidence presented by the State did not militate so overwhelmingly in favor of guilt as to overcome the effect of

the detective's statement. The jail phone call, though it undercut Craft's defense, did not unequivocally place Craft at the scene of the crime or include any explicit admissions. His statement that he expected to "do a nickel" could simply have indicated that he feared a conviction for the crime with which he was being charged. His statement that he told his "homeboys" to "leave all the electronics" suggests that he was aware of their intention to commit a crime but does not establish that he was at the house when the crime was committed, as the prosecution asserted. Craft was not found in possession of any stolen property, and neither his DNA nor his fingerprints were found on any of the stolen items. The vehicle where evidence was found belonged to one of the other codefendants, and there was no evidence connecting Craft to that vehicle.

¶31   Craft's counsel highlighted the weaknesses in the evidence by bringing in the expert witness to enlighten the jury about the limitations of eyewitness testimony generally and the witness's testimony in particular; by pointing out the ambiguities in the jail phone call; and by questioning police witnesses regarding the lack of physical evidence connecting Craft to the crime. Counsel also raised questions regarding the witness's credibility by presenting evidence suggesting that the witness had lied on the stand about distributing marijuana, despite having been granted immunity from prosecution for marijuana possession or distribution.

¶32   In sum, while there was certainly evidence of guilt, it was not overwhelming, and the question of Craft's participation in the crime must have presented some challenge for the jury. That challenge was effectively eliminated by the detective's statement, which provided a direct and easy answer to the disputed question: Craft was there because his codefendants said so. And though nothing was said or done to focus attention on the statement, neither was this potentially conclusive piece of evidence challenged or qualified in any way at trial. And it seems unlikely that a statement so central to the outcome would

have simply passed unnoticed by the jury. Rather, the testimony would likely have significantly undermined the jury's commitment to full consideration of whether the admissible evidence raised any reasonable doubt about Craft's guilt and thereby weakened the fundamental protection afforded a defendant by the prosecution's burden of proof.

¶33    Accordingly, we conclude that trial counsel's failure to move for a mistrial based on the detective's statement amounts to ineffective assistance of counsel.

CONCLUSION

¶34    Because the eyewitness testimony was sufficiently reliable under *Ramirez*, counsel did not perform deficiently in declining to pursue a motion to exclude it. However, counsel's failure to move for a mistrial based on the detective's improper statement "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result," *Strickland v. Washington*, 466 U.S. 668, 686 (1984), and requires that we vacate Craft's convictions. Accordingly, we do so and remand the case for a new trial.

———————