2018 UT App 134

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
FRANK PAUL REYOS,
Appellant.

Opinion
No. 20160557-CA
Filed July 6, 2018

Third District Court, Salt Lake Department
The Honorable Vernice S. Trease
No. 141910332

Teresa L. Welch, Attorney for Appellant

Sean D. Reyes and Kris C. Leonard, Attorneys
for Appellee

JUDGE MICHELE M. CHRISTIANSEN authored this Opinion, in
which JUDGES DAVID N. MORTENSEN and RYAN M. HARRIS
concurred.

CHRISTIANSEN, Judge:

¶1     A jury convicted Defendant Frank Paul Reyos of three
counts of aggravated robbery, all first degree felonies, with an
enhanced penalty under Utah Code section 76-3-203.1
(the Group Crime Enhancement) for having "acted in concert
with two or more persons." Defendant contends that his trial
counsel was ineffective for failing to object to two eyewitness
identifications as unreliable. He also contends that the evidence
was insufficient to support his aggravated robbery convictions
and to support application of the Group Crime Enhancement.
We affirm.

BACKGROUND[1]

¶2     On the evening of September 7, 2012, three friends (Witness One, Witness Two, and Witness Three) met at a bar in downtown Salt Lake City. Witness One drank three beers, Witness Two drank one cocktail, and Witness Three drank one beer and one cocktail. At one point, the friends stepped into an alley behind the bar to smoke a cigarette. Although it was dark outside, there was ambient lighting in the alley from a nearby lamppost and a few "parking lights." The alley was designed so that vehicles had to enter and leave by the same route, and there were no surveillance cameras in the alley.

¶3     Approximately ten minutes after the friends went outside, an "older, four-door, . . . dark-green Honda" with tinted windows drove into the alley and made a U-turn. The driver and the person in the passenger seat were both females. The driver stopped the car approximately thirty feet from the friends, angling the car toward the alley's exit. Two men then got out of the back seat of the car and started to approach the friends. As they approached, one of the men asked the friends, "Does this place ID?" Witness One responded, "Yes, it's a bar. They will ID." One of the men (Robber One) stopped approximately three to five feet from Witnesses One and Two. The second man (Robber Two) stopped less than two feet from Witness Three, who was separated from Witnesses One and Two by a "big, metal thing."

¶4     Both robbers pulled out guns and told the friends to "[g]ive us all your shit." Witnesses One and Two remembered

---

1. We review the facts in the light most favorable to the jury's verdict and recite them accordingly. *State v. Holgate*, 2000 UT 74, ¶ 2, 10 P.3d 346. "We present conflicting evidence only as necessary to understand issues raised on appeal." *Id.*

Robber One's gun as having a long barrel—approximately eight to ten inches long. Witness One stepped slightly in front of Witness Two to stop Robber One from getting any closer to Witness Two. Witness One gave Robber One his wallet and cell phone, and Witness Two gave Robber One her purse. Witness Three gave Robber Two a small amount of cash. During this time, Robber One did not point his gun at Witnesses One or Two, instead keeping it by his side. The robbers then returned to the car, dropping Witness One's cell phone in the alley on the way. Once the robbers were in the back seat of the car, the female driver "sped" out of the alley. The whole event lasted approximately two to three minutes.

¶5     Shortly thereafter, Witness One called 911. When the responding officer arrived, he took a description of Robber One from Witnesses One and Two; Witness Three had already left the scene. Witness One described Robber One as a twenty-nine-year-old Hispanic male, with a "thin build," weighing 160 pounds, with a shaved head and no facial hair. He stated that Robber One was heavily tattooed, with tattoos on his arms, legs, neck, and face. Witness One specifically reported that Robber One had a teardrop tattoo on his face. Witness One stated that the robbers left in a two-door car with tinted windows and that the car was occupied by two females and two males. Witness Two reported that the car had four doors. A detective took over the case the next day.

¶6     Three days later, a different detective was looking for Defendant on an unrelated matter. The relevant car in that matter was a 1997 green Honda Accord. The detective located the car and later observed Defendant driving it with a female passenger. When the detective investigating the alley robberies heard about Defendant and the car, he suspected that Defendant might have participated in the alley robberies.

¶7     The investigating detective put together a photo lineup, using a photo of Defendant and five photos of other men with similar characteristics, including facial tattoos and no hair (or a shaved head). The photos were in color and were the same size. The investigating detective asked another detective to administer the photo lineup to Witnesses One and Two.[2] Six days after the robberies, the other detective conducted a photo lineup with Witness Two while she was at work. The detective explained the photo lineup procedure and told Witness Two that she should not feel obligated to pick anyone. The detective then showed the photos to Witness Two, and she identified Defendant as Robber One. When the detective asked about Witness Two's confidence level in her choice, she stated it was "very high." Four days later, the same detective repeated the photo lineup procedure with Witness One at the police station. Witness One also picked Defendant's photo as the person who robbed them at gunpoint. He later testified that he was "very confident" in his identification.

¶8     Thereafter, the State charged Defendant with three counts of aggravated robbery, first degree felonies, with each count enhanced to "an indeterminate prison term of not less than five years in addition to the statutory minimum prison term for the offense, and which may be for life" under the Group Crime Enhancement provision. *See* Utah Code Ann. § 76-3-203.1(4)(e) (LexisNexis 2012).

¶9     At trial, Witnesses One and Two both identified Defendant as Robber One and discussed their observations from the night of the robbery. Defendant's trial counsel focused on attacking the eyewitnesses' identifications of Defendant through cross-examination and in closing argument. He also presented evidence that, shortly after the robbery occurred, Defendant's

---

2. Witness Three did not participate in a photo lineup.

picture "was blasted all over the news online, on TV, [and] in print" in connection with an unrelated matter. Trial counsel suggested to the jury that the eyewitnesses "made the mistake of subconsciously seeing that information, and they recognized that face from online, and that's why they picked [Defendant] . . . out of the lineups." The jury was also given an instruction advising them about various factors that affect the reliability of eyewitness identifications. *See State v. Long*, 721 P.2d 483, 492–93 (Utah 1986) (requiring trial courts to give a cautionary jury instruction "whenever eyewitness identification is a central issue in a case and such an instruction is requested by the defense").

¶10 The jury ultimately found Defendant guilty of three counts of aggravated robbery and determined that the Group Crime Enhancement applied. Defendant appeals.

ISSUES AND STANDARDS OF REVIEW

¶11 Defendant contends that his trial counsel was constitutionally ineffective for failing to challenge the admissibility of the eyewitnesses' identifications of him. "An ineffective assistance of counsel claim raised for the first time on appeal presents a question of law." *State v. Clark*, 2004 UT 25, ¶ 6, 89 P.3d 162. To prove his ineffective assistance of counsel claim, Defendant must demonstrate that his "counsel's performance was objectively deficient" and that "a reasonable probability exists" that he "would have obtained a more favorable outcome at trial" but for his counsel's deficient conduct. *Id.*

¶12 Defendant also contends that the evidence was insufficient to support his convictions and the application of the Group Crime Enhancement. Defendant concedes that he did not preserve these arguments, and he seeks review under the plain-error and ineffective-assistance-of-counsel exceptions to the preservation requirement. A "trial court plainly errs if it

submits the case to the jury and thus fails to discharge a defendant when the insufficiency of the evidence is apparent to the court." *State v. Holgate*, 2000 UT 74, ¶ 17, 10 P.3d 346. "[T]o establish plain error, a defendant must demonstrate first that the evidence was insufficient to support a conviction of the crime charged and second that the insufficiency was so obvious and fundamental that the trial court erred in submitting the case to the jury." *Id.* When a defendant challenges the sufficiency of the evidence, we review "the evidence and all inferences drawn therefrom in a light most favorable to the jury's verdict." *Id.* ¶ 18. As explained above, Defendant's ineffective assistance of counsel claims present questions of law, and Defendant must demonstrate that his counsel's performance was deficient and that the deficient performance prejudiced his defense. *See Clark*, 2004 UT 25, ¶ 6.

ANALYSIS

I. Eyewitness Identifications

¶13 Defendant contends that trial counsel was ineffective for failing to object to the eyewitnesses' identifications of him.

¶14 To prevail on his ineffective assistance of counsel claim, Defendant must show both that trial counsel's performance was deficient and that this deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In demonstrating that counsel's performance was deficient, Defendant must "rebut the strong presumption that 'under the circumstances, the challenged action might be considered sound trial strategy.'" *State v. Litherland*, 2000 UT 76, ¶ 19, 12 P.3d 92 (quoting *Strickland*, 466 U.S. at 689).

¶15 In *State v. Ramirez*, 817 P.2d 774 (Utah 1991), our supreme court explained the standard for Utah courts to use in analyzing

the admissibility of eyewitness identifications. *See id.* at 779, 781–82. The supreme court outlined five factors courts should consider in determining whether an eyewitness identification is "sufficiently reliable that its admission and consideration by the jury will not deny the defendant due process." *Id.* at 779, 781. "The ultimate question to be determined is whether, under the totality of the circumstances, the identification was reliable." *Id.* at 781. The five *Ramirez* factors include:

> "(1) [T]he opportunity of the witness to view the actor during the event; (2) the witness's degree of attention to the actor at the time of the event; (3) the witness's capacity to observe the event, including his or her physical and mental acuity; (4) whether the witness's identification was made spontaneously and remained consistent thereafter, or whether it was the product of suggestion; and (5) the nature of the event being observed and the likelihood that the witness would perceive, remember and relate it correctly. This last area includes such factors as whether the event was an ordinary one in the mind of the observer during the time it was observed, and whether the race of the actor was the same as the observer's."

*Id.* (alteration in original) (quoting *State v. Long*, 721 P.2d 483, 493 (Utah 1986)).

¶16    Because Defendant challenges his convictions on the basis of ineffective assistance of counsel, "we are not directly tasked with determining whether the eyewitness testimony was admissible." *See State v. Craft*, 2017 UT App 87, ¶ 18, 397 P.3d 889. Nevertheless, the admissibility of the evidence necessarily informs our determination of whether trial counsel performed deficiently in not seeking to have it excluded. *Id.*

¶17    Recently, in *State v. Lujan*, 2015 UT App 199, 357 P.3d 20, *cert. granted*, 364 P.3d 48 (Utah 2015), this court observed that "[w]e have every reason to believe . . . that *Ramirez* must be revisited" in light of the progress in "scientific and legal research regarding the reliability of eyewitness identifications," and we urged our supreme court to reconsider *Ramirez*. *Id.* ¶ 10 n.1. Our supreme court granted certiorari in *Lujan* but has not yet issued a decision. Consequently, "*Ramirez* remains the standard by which we evaluate eyewitness identification evidence, and we must evaluate counsel's performance in light of that standard." *See Craft*, 2017 UT App 87, ¶ 19 (quotation simplified).

¶18    In *Ramirez*, the relevant eyewitness viewed the perpetrator from a distance of ten to thirty feet for somewhere between "a few seconds" and "a minute or longer." 817 P.2d at 782 (internal quotation marks omitted). The perpetrator was "wearing a mask over the lower part of his face," and the eyewitness was unable to see the perpetrator's face except for his "small eyes." *Id.* The eyewitness could otherwise describe only the perpetrator's general height and clothing. *See id.* at 784. At the time he viewed the perpetrator, the eyewitness's attention was divided between the perpetrator and another man, who was threatening and swinging a pipe at the eyewitness. *Id.* at 783. Despite the man with the pipe, the eyewitness made an effort to look at the perpetrator, "trying to get a good description." *Id.* The eyewitness had good eyesight, and he was not impaired by fatigue, injury, drugs, or alcohol. *Id.*

¶19    Approximately thirty minutes to an hour after the incident, the eyewitness identified the defendant while the defendant was handcuffed to a chain link fence with the headlights of several police cars trained on him. *Id.* at 783–84. The eyewitness viewed the defendant from the back seat of a police car, and officers told the eyewitness beforehand that they had apprehended a suspect who fit the description of the perpetrator the witness had seen earlier that night. *Id.* at 784.

Although it was "an extremely close case," and although "[t]he blatant suggestiveness of the showup" was "troublesome" and "compounded because none of the witnesses . . . ever saw the full face of the [perpetrator]," our supreme court ultimately determined that the identification was sufficiently reliable to be admissible. *Id.*

¶20     Applying the *Ramirez* factors to the circumstances of this case, we conclude that the eyewitness identifications here are at least as reliable as the eyewitness identification in *Ramirez*. The fourth *Ramirez* factor addresses the eyewitnesses' later identification of Robber One; the other factors address the eyewitnesses' observation of the event.

A.      Opportunity to View Robber One

¶21     "The first factor to be considered in determining the reliability of the identification is the opportunity of the witness to view the actor during the event." *Id.* at 782. Under this factor, relevant circumstances include

> the length of time the witness viewed the actor; the distance between the witness and the actor; whether the witness could view the actor's face; the lighting or lack of it; whether there were distracting noises or activity during the observation; and any other circumstances affecting the witness's opportunity to observe the actor.

*Id.*

¶22     In this case, the eyewitnesses testified that the robberies lasted between two and three minutes. Witness One was "face-to-face three feet away" from Robber One, and Witness Two was "four to five feet away" from Robber One. Witness Two clarified that even though Witness One had stepped between her and

Robber One, Witness One was not directly in front of her and she could still "see [Robber One's] full body." Robber One's face was not obstructed during the crime. Although the robberies occurred outside at night, the eyewitnesses testified that the alley was "not pitch black"—there was "some ambient light" from lampposts and a "few . . . parking lights." Witness One testified that "even though it was a little bit dark in the alley, [he] could see tattoos on [Robber One's] face just fine." He further stated that "[t]here was enough light" for him to see the color, make, and model of the getaway car, and he could see that the car's windows were tinted. These facts indicate that the eyewitnesses had an adequate opportunity to view Robber One.

B.     Degree of Attention

¶23     The second factor contemplates "the witness's degree of attention to the actor at the time of the event." *Id.* at 781 (quotation simplified). The record indicates that the eyewitnesses first began paying attention to the robbers when the robbers exited the car and started to approach them. Witness One testified that the robbers started talking to the eyewitnesses from about thirty feet away and that he thought the robbers' question about whether the bar checked IDs "was a really strange question." *See supra* ¶ 3. As the robbers continued their approach, "they were trying to . . . make small talk" with the eyewitnesses, and Witness One became "more on alert and concern[ed]" as the robbers got closer. Witnesses One and Two testified that Robber One pulled out a gun and told them to "[g]ive us all your shit" or "[g]ive me everything you've got." They both remembered the gun as having a long barrel. Witnesses One and Two further testified that, during the robberies, Robber One held the gun "in his right hand down by his side" and "didn't point it directly" at them.

¶24     Witness Two testified that she "had been looking at [Robber One's] face" until he pulled out the gun, at which point

her focus shifted to the gun. But she also stated that she looked at Robber One's face again after he brought out the gun. Both eyewitnesses observed that as Witness One was reaching for his wallet, Robber One was "getting a little flustered" and was "really nervous." Witness One further testified that although he had a "sense of what was going on" with Witness Three and Robber Two, he was "focused on what was happening in front of [him]" with Robber One. While the presence of the gun and Robber Two necessarily diverted some of the eyewitnesses' attention from Robber One, overall, the facts indicate that Robber One was the focus of their attention.

C.      Capacity to Observe

¶25     The third factor is "whether the witness had the capacity to observe the actor during the event." *Ramirez*, 817 P.2d at 783. Under this factor, relevant considerations include "whether the witness's capacity to observe was impaired by stress or fright at the time of the observation, by personal motivations, biases, or prejudices, by uncorrected visual defects, or by fatigue, injury, drugs, or alcohol." *Id.*

¶26     The record indicates that the eyewitnesses experienced a heightened degree of stress during the incident. *See id.* Witness Two testified that once Robber One pulled out the gun, she was "in shock." Witness One testified that the event was shocking and that he felt fear and panic. However, we think the eyewitnesses' fear in this case would be typical of any armed robbery. *See State v. Rivera*, 954 P.2d 225, 228 (Utah Ct. App. 1998) (concluding, where the victim had been nervous and afraid during an armed robbery, that the victim's "ordinary fear" was insufficient to defeat the third *Ramirez* factor; "[o]therwise, no victim of a violent crime could ever meet this factor"). And we agree with the State that "nothing in the circumstances surrounding the robbery and nothing about the [eyewitnesses] themselves suggests that they suffered such a heightened degree

of stress that it interfered with their capacity to observe and identify." Although Robber One had a gun, he kept it down by his side and never pointed it at the eyewitnesses. Moreover, the eyewitnesses were able to observe the robbers as they approached the eyewitnesses—before the guns came out and before the eyewitnesses had reason to be overly fearful.

¶27    There is no evidence that the eyewitnesses harbored any personal motivations, bias, or prejudice against Robber One. *See Ramirez*, 817 P.2d at 783. Regarding the eyewitnesses' vision, Witness One testified that he had 20/20 vision, and Witness Two testified that she was wearing her contacts on the night of the incident and was therefore able to see corrected to 20/20. Although there was no evidence of "fatigue, injury, [or] drugs," both eyewitnesses had been drinking that night. *See id.* Witness One had consumed three beers, but he testified that he drank beer "[f]airly regularly" and was "well enough aware of the situation to know what was going on." Witness Two testified that she had consumed one cocktail before the incident. On these facts, the eyewitnesses' alcohol use was not enough to seriously impair their capacity to observe Robber One.

D.    Spontaneity, Consistency, and Suggestibility of the Identifications

¶28    The fourth factor is "whether the witness's identification was made spontaneously and remained consistent thereafter or whether it was a product of suggestion." *Id.* This factor includes consideration of

> the length of time that passed between the witness's observation at the time of the event and the identification of [the] defendant; the witness's mental capacity and state of mind at the time of the identification; the witness's exposure to opinions, descriptions, identifications, or other information

from other sources; instances when the witness or other eyewitnesses to the event failed to identify [the] defendant; instances when the witness or other eyewitnesses gave a description of the actor that is inconsistent with [the] defendant; and the circumstances under which [the] defendant was presented to the witness for identification.

*Id.*

¶29 Here, Witness Two identified Defendant in a photo lineup conducted at her workplace six days after the incident. *Cf. State v. Hollen*, 2002 UT 35, ¶ 47, 44 P.3d 794 (noting that "the witnesses had at least two months to recover from the stress of the robbery before their identifications"); *State v. Gallegos*, 2016 UT App 172, ¶¶ 53–55, 380 P.3d 44 (affirming the trial court's decision to admit a photo identification conducted thirty days after the crime, even though the photo array violated best practices in several ways). Nothing in the record shows that Witness Two was stressed or that she had diminished mental capacity at the time she identified Defendant. The procedure was "double-blind," meaning that the detective who administered the identification procedure did not know which of the pictured men was the suspect. The detective showed Witness Two six color photos: one of Defendant and five of other men who shared Defendant's physical characteristics—no hair (or with very short hair) and facial tattoos. The photos were the same size and showed each person's head, face, and upper chest. Before administering the photo lineup, the detective explained to Witness Two that he would show her six photos, one at a time. The detective asked Witness Two to tell him if she saw the person who robbed her, but he explained that he "would continue to show her the rest of the photos" even if she did identify someone. The detective urged Witness Two to focus on physical characteristics that did not change, such as "eyes, cheek bones, nose, [and] ears." He also explained to Witness Two that

she was not obligated to pick anyone from the photo lineup and that the investigation would continue if she did not pick anyone. Witness Two picked Defendant's photo. The detective asked her if she was sure, and Witness Two stated that she was "not a hundred percent sure, but it's very high."

¶30 Four days later, i.e., ten days after the crime, the same detective repeated the same procedure with Witness One at the police station. Similar to Witness Two, nothing in the record demonstrates that Witness One had diminished mental capacity at the time of the identification. The detective followed the same format he used with Witness Two, but he showed Witness One the photos in a different order. Witness One picked Defendant's photo. He testified at trial that he "was very confident" in his selection. Overall, these facts demonstrate that the identifications were not the product of a suggestive photo lineup.

¶31 Nevertheless, Defendant asserts that Witnesses One and Two had "opportunities to see Defendant's picture" on the news before looking at the photo lineup and that the eyewitnesses' identifications of Defendant were "the product of suggestion." Specifically, Defendant observes that in September 2012, his photo was "displayed on various online, print, and television news stories" regarding an unrelated matter. According to Defendant, these opportunities to view his picture "likely influenced" the eyewitnesses' identifications during the photo lineups. We are not persuaded.

¶32 The record indicates that in September 2012, a picture of Defendant appeared in various print, online, and television news stories on an unrelated matter. However, both eyewitnesses testified that they had not seen any news reports whatsoever containing Defendant's picture before the photo lineups. Witness Two testified that although she worked at a restaurant that had televisions, the restaurant "[n]ever [showed] the news, just sporting events." She further testified that she does not watch

the news or look at the news online, including social media. She stated that she was "not interested" and that the news is "just very negative." When specifically asked if she remembered seeing any news stories on September 11, 2012, about a man with facial tattoos "being apprehended by the Salt Lake City Police Department," Witness Two replied, "No." Witness One testified that he had seen Defendant's picture in the news, but only *after* the photo lineup. On this record, Defendant's assertion that the eyewitnesses' identifications were the product of suggestion is entirely speculative and does not undermine the reliability of the eyewitnesses' photo identifications.

¶33   Defendant also asserts that "the eyewitnesses' initial description of the robbers . . . did not accurately identify [him]" and that this discrepancy is best explained by "the impact of [the eyewitnesses] seeing [his] picture on the news right after the robbery." Specifically, Defendant asserts that the eyewitnesses' height estimates did not match his height of 5'7" and that Witness One told the responding officer that Robber One had a teardrop tattoo on his face, which tattoo Defendant does not have. Again, we are not persuaded.

¶34   We agree with the State that, "[w]hile none of the witnesses accurately guessed the robber's exact height, their estimates fit [Defendant]." Witness Two, who is 5'6", told officers at the photo lineup that Robber One was around 5'8" or 5'9". Witness One, who is 5'10", stated that Robber One was "a little bit shorter" than he is and that he "could see over the top of [Robber One's] head." These descriptions of Robber One's height relative to that of Witnesses One and Two are generally consistent with Defendant's height of 5'7". Defendant expressly points to Witness Three's statement, which was given to a detective over the phone, that "one of the robbers [was] 5'10" and the other suspect [was] 5'2"." But Witness Three was approximately ten feet away from Robber One during the crimes, and Witness Three testified at trial that he could not give

an accurate description of Robber One. In any event, we ultimately agree with the State that "the accuracy of Witness Three's estimate has no bearing on the accuracy of [Witnesses One and Two's] descriptions."

¶35 Defendant also observes that Witness One told a responding officer that Robber One had a teardrop tattoo on his face. Defendant does not have a teardrop tattoo on his face, but he does have a tattoo under the outside corner of his left eye that the State characterizes as "an arrow pointing upwards." We agree with the State that, "in the lighting described by the witnesses, the mark could readily be mistaken for a teardrop." Moreover, the "teardrop" tattoo was only part of the basis for Witnesses One's identification of Defendant. Indeed, despite the discrepancy regarding the "teardrop" tattoo, Witness One's initial description of Robber One, while not overly detailed, was otherwise generally consistent with Defendant's appearance— male, Hispanic, thin build, approximately 160 pounds, shaved head, no facial hair, and "heavily tattooed" on his arms, legs, neck, and face. Under the totality of the circumstances, the relatively minor inconsistency in Witness One's description of Robber One does not render his entire identification unreliable.

E.     The Nature of the Event

¶36    The fifth and final factor considers "the nature of the event being observed and the likelihood that the witness would perceive, remember and relate it correctly." *Ramirez*, 817 P.2d at 781 (quotation simplified). Considerations under this factor include "whether the event was an ordinary one in the mind of the observer during the time it was observed, and whether the race of the actor was the same as the observer's." *Id.* (quotation simplified). Here, the eyewitnesses described the robber as "Hispanic"; however, nothing in the record indicates the eyewitnesses' race, and Defendant does not address this consideration on appeal. The record indicates that while the

eyewitnesses did not initially recognize the situation as a robbery, the eyewitnesses were nonetheless paying attention to, and interacting with, the robbers as they approached the eyewitnesses. Once Robber One brandished his gun and demanded that Witnesses One and Two "[g]ive us all your shit," there can be little doubt that the eyewitnesses were aware that a robbery was occurring. The lighting conditions in the alley allowed the eyewitnesses to view Robber One's unobstructed face, relative height, multitude of tattoos, and gun. Overall, these circumstances "tended to focus" the eyewitnesses' attention on what was occurring and suggest that the eyewitnesses were likely to perceive, remember, and relate the robbery correctly to law enforcement. *See State v. Hollen*, 2002 UT 35, ¶ 61, 44 P.3d 794 (quotation simplified).

¶37 In evaluating the admissibility of eyewitness evidence, "[c]ourts must simply decide whether the testimony was sufficiently reliable so as not to offend a defendant's right to due process by permitting clearly unreliable identification testimony before the jury." *State v. Craft*, 2017 UT App 87, ¶ 22, 397 P.3d 889 (quotation simplified). Having considered the two eyewitnesses' identifications of Defendant under each of the five *Ramirez* factors, we conclude that the eyewitnesses' identifications were "sufficiently reliable to pass constitutional muster under the *Ramirez* standard." *See id.* Thus, "[i]n light of *Ramirez* and its continuing authority on the issue of eyewitness identification, it would not have been unreasonable for counsel to determine that attempting to discredit the testimony at trial was a better strategy than pursuing a likely futile motion to exclude the testimony." *See id.* The record demonstrates that trial counsel focused on discrediting the eyewitnesses' testimony at trial through cross-examination and in closing argument, and by presenting evidence that various media outlets had been circulating Defendant's picture around the time the photo lineups occurred. The jury also received a *Long* instruction, which trial counsel emphasized in closing argument. *See State v.*

*Long*, 721 P.2d 483, 487–95 (Utah 1986). Accordingly, we are not persuaded that Defendant's trial counsel performed deficiently in forgoing a motion to exclude the eyewitness identifications.[3]

## II. Sufficiency of the Evidence

¶38 Next, Defendant contends that there was insufficient evidence to support his convictions for aggravated robbery and that the evidence was likewise insufficient to support the application of the Group Crime Enhancement. Defendant concedes that "[t]he insufficiency issues were not preserved" and seeks review under the plain-error and ineffective-assistance exceptions to the preservation requirement.

¶39 To establish plain error regarding the sufficiency of the evidence, "an appellant must show first that the evidence was insufficient to support a conviction of the crimes charged and second that the insufficiency was so obvious and fundamental that the trial court erred in submitting the case to the jury." *State v. Diaz*, 2002 UT App 288, ¶ 32, 55 P.3d 1131 (quotation simplified); *see also State v. Holgate*, 2000 UT 74, ¶ 17, 10 P.3d 346 ("While it is difficult for the court on appeal to dictate when an evidentiary defect was apparent to the trial court, there is a certain point at which an evidentiary insufficiency is so obvious and fundamental that it would be plain error for the trial court not to discharge the defendant. An example is the case in which the State presents *no* evidence to support an essential element of a criminal charge.").

---

3. Although Defendant also purports to challenge the eyewitnesses' in-court identifications of him, he does not analyze that claim separately from the eyewitnesses' out-of-court identifications, and therefore neither do we.

¶40   Considering the evidence in the light most favorable to the jury's verdict, "we first examine the record to determine whether . . . the evidence is sufficiently inconclusive or inherently improbable such that reasonable minds must have entertained a reasonable doubt that the defendant committed the crimes for which he or she was convicted." *Diaz*, 2002 UT App 288, ¶ 33 (quotation simplified). "Only then will we undertake an examination of the record to determine whether the evidentiary defect was so obvious and fundamental that it was plain error to submit the case to the jury." *Id.* (quotation simplified).

¶41   A person commits aggravated robbery if, in the course of committing robbery, he "uses or threatens to use a dangerous weapon." Utah Code Ann. § 76-6-302(1)(a) (LexisNexis 2012); *see also id.* § 76-6-301 (defining robbery). Defendant does not challenge that the robberies occurred or that a dangerous weapon was involved; rather, he asserts only that the evidence was insufficient to show that he "was present at the scene of the robbery." Specifically, he asserts that the eyewitness testimony was "unreliable" and that "additional independent evidence" placing him at the crime scene was therefore necessary to support the jury's verdict.

¶42   However, our determination that the eyewitnesses' testimony was sufficiently reliable under *Ramirez* to be admissible essentially resolves this issue. *See State v. Craft*, 2017 UT App 87, ¶ 15 n.1, 397 P.3d 889. That is, the eyewitnesses' testimony, placing Defendant at the scene of robberies, as apparently believed by the jury, provided sufficient evidence of Defendant's guilt. *See id.* Because there was sufficient evidence to support Defendant's aggravated robbery convictions, we conclude that the trial court did not commit plain error in

submitting the matter to the jury for determination.[4] *See Diaz*, 2002 UT App 288, ¶ 33.

¶43    Defendant also raises this argument under the ineffective assistance of counsel exception to the preservation rule. As discussed above, to prevail on his ineffective assistance of counsel claim, Defendant must show both that trial counsel's performance was deficient and that this deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). However, "the failure of counsel to make motions or objections which would be futile if raised does not constitute ineffective assistance." *State v. Whittle*, 1999 UT 96, ¶ 34, 989 P.2d

---

4. In support of his argument that "additional independent evidence" was necessary to support the jury's verdict, Defendant observes that (1) he "was never found to be in possession of the stolen items," (2) there was no video footage depicting him at the crime scene, (3) there "were no unique clothing articles" tying him to the crime, (4) there was no DNA evidence, and (5) there was no palm print or fingerprint evidence tying him to the crime.

   We agree with the State that the absence of these other types of evidence does not somehow render the evidence that *was* presented at trial—the eyewitnesses' testimony— "sufficiently inconclusive or inherently improbable such that reasonable minds must have entertained a reasonable doubt" that Defendant committed the crimes for which he was convicted. *See State v. Diaz*, 2002 UT App 288, ¶ 33, 55 P.3d 1131 (quotation simplified); *see also State v. Ashcraft*, 2015 UT 5, ¶ 28, 349 P.3d 664 ("A reviewing court is not to measure the sufficiency of the evidence against a hypothetical—CSI-based— investigative ideal. Instead of imagining the evidence that *might have been* presented, we consider the evidence that *was* presented, and evaluate its sufficiency through a lens that gives the jury's verdict the benefit of all reasonable inferences.").

52 (quotation simplified). Because there was sufficient evidence to support the jury's verdicts, a motion for directed verdict based on the sufficiency of the evidence would have been futile, and we therefore conclude that trial counsel did not render deficient performance by failing to make such a motion. *See State v. Johnson*, 2015 UT App 312, ¶ 16, 365 P.3d 730; *see also id.* ¶ 15 (observing that where the trial court did not plainly err in submitting a charge to the jury, "it follows that counsel's acquiescence in the charge being submitted was not objectively deficient performance").

¶44 Defendant next asserts that, "even if it is assumed that [he] participated in the robbery," there was insufficient evidence demonstrating that he acted in concert with two or more persons under the Group Crime Enhancement statute. More specifically, he asserts that "there were only two men involved in the robbery and there was no reasonable evidence to support a finding that the females located in the Honda were involved in the commission of the aggravated robbery crimes." Defendant again seeks review under the plain-error and ineffective-assistance exceptions to our preservation requirement.

¶45 The Group Crime Enhancement statute provides that a person convicted of aggravated robbery "is subject to an enhanced penalty for the offense . . . if the trier of fact finds beyond a reasonable doubt that the person acted . . . in concert with two or more persons." Utah Code Ann. § 76-3-203.1(2)(a) (LexisNexis 2012); *see also id.* § 76-3-203.1(5)(i) (applying the enhancement to robbery and aggravated robbery). "'In concert with two or more persons' means: (i) the defendant was aided or encouraged by at least two other persons in committing the offense and was aware of this aid or encouragement" and (ii) "each of the other persons: (A) was physically present; or (B) participated as a party to any offense listed in Subsection (5)." *Id.* § 76-3-203.1(1)(b).

¶46 This court has previously observed that "[t]o 'aid' is 'to provide with what is useful or necessary in achieving an end,'" and "to 'encourage' means 'to instigate, to incite to action, to embolden, or to help.'" *State v. Cristobal*, 2010 UT App 228, ¶ 11, 238 P.3d 1096 (quotation simplified). Based on these definitions, it is evident that "something more than passive presence during the commission of a crime is required to constitute aiding or encouragement." *Id.* ¶ 12 (quotation simplified). Thus, "under the Group Crime Enhancement statute, it is not enough that others were present when the crime was committed; rather, the quality of their involvement must rise to the level of participation described in the statute: aiding or encouraging." *Id.* ¶ 13 (quotation simplified); *see also State v. Labrum*, 959 P.2d 120, 123 (Utah Ct. App. 1998) ("Mere presence, or even prior knowledge, does not make one an accomplice when he neither advises, instigates, encourages, or assists in perpetration of the crime." (quotation simplified)). But while another person's mere presence at the scene of the crime provides no basis for application of the Group Crime Enhancement, "conduct before and after the offense is a circumstance from which one's participation in the criminal act may be inferred." *Cristobal*, 2010 UT App 228, ¶ 13 (quotation simplified).

¶47 Likewise, similar to "mere presence" at the scene of the crime, another person's "flight from the scene of the crime," by itself, does not prove that one aided or encouraged the criminal activity "but is a circumstance from which [one's] involvement may be inferred." *See id.* ¶ 15; *see also id.* ¶ 14 ("Flight by itself is not sufficient to establish guilt but is merely a circumstance to be considered with other factors as tending to show a consciousness of guilt and therefore guilt itself." (quotation simplified)).

¶48 The State correctly observes that, because there were two robbers, it "only had to prove a third person's participation" in the robberies to support the application of the Group Crime Enhancement. The State asserts that the unidentified female

driver's presence at, and flight from, the crime scene support a reasonable inference that she aided or encouraged Defendant. We agree.

¶49   For the issue of the Group Crime Enhancement to be submitted to the jury, "there had to be sufficient evidence, including the logical and reasonable inferences that could be drawn therefrom," *see State v. Holgate*, 2000 UT 74, ¶ 22, 10 P.3d 346, that the unidentified female driver aided or encouraged Defendant and that Defendant was aware of her aid or encouragement, *see* Utah Code Ann. § 76-3-203.1(1)(b). The following evidence was before the trial court:

> (1) The unidentified female drove the robbers to the crime scene—the alley.
>
> (2) The alley had only one access point for vehicles; thus, vehicles accessing the alley had to enter and exit via the same route.
>
> (3) When the unidentified female drove into the alley, she conducted a U-turn and positioned the car so that it was facing the alley's lone exit.
>
> (4) The unidentified female stayed in the car when the robbers got out, and she did not otherwise attempt to leave the alley during the robbery, or attempt to engage with or stop the two robbers.
>
> (5) After the robberies, the two robbers immediately returned to the car.
>
> (6) The unidentified female waited for the robbers to return to the car, and she then "sped" out of the alley.

¶50 From this evidence, a jury could reasonably infer that the unidentified female was not merely present at the crime scene, but that she instead aided or encouraged the robbers by acting as a getaway driver. *Cf. State v. Jimenez*, 2012 UT 41, ¶ 14, 284 P.3d 640 ("By driving the getaway car, [the defendant] became an accomplice to the aggravated robbery."); *In re M.B.*, 2008 UT App 433, ¶ 17, 198 P.3d 1007 (acknowledging that "*drivers* of getaway cars are typically found guilty under accomplice liability theories because, as a driver, they inherently show active involvement in the crime"). Upon entering the alley, the unidentified female made a U-turn and positioned the car so that it was facing the alley's only exit, reasonably suggesting that she anticipated the need to leave the alley quickly and, by extension, that she knew of the robberies in advance. The car's proximity to the robberies and the presence of ambient lighting in the alley support an inference that the unidentified female was aware of the ongoing criminal activity. She made no attempt to leave the car or the alley during the robberies, reasonably suggesting that she was waiting for the robbers to return. And indeed, she did wait for the robbers to return, at which point she "sped" out of the alley, helping the robbers to flee from the crime scene. Another reasonable inference from these facts is that the unidentified female was acting as a lookout and watching the alley's entrance for any unwanted newcomers.

¶51 Regarding Defendant's awareness of the unidentified female driver's part in the robberies, the record demonstrates that the unidentified female driver transported the robbers to the crime scene, and the robbers stayed in the car until she had positioned the car toward the alley's exit. After committing the robberies, the robbers immediately returned to the car to flee, reasonably suggesting that they expected the unidentified female driver to stay in the alley and wait for them to complete their crimes. From these facts, a jury could reasonably infer that Defendant was aware of the unidentified female driver's aid or encouragement.

¶52 Reviewing the evidence and the reasonable inferences to be drawn therefrom, we conclude that a jury reasonably could have found that Defendant acted in concert with two or more persons and that the Group Crime Enhancement therefore applied. The unidentified female driver's presence at, and flight from, the crime scene, when considered together, support a reasonable inference that she was an active participant in the robberies and that she aided or encouraged Defendant in committing the robberies. Consequently, the trial court did not commit plain error in submitting the matter of the Group Crime Enhancement to the jury for determination.

¶53 Defendant also asserts that his trial counsel was ineffective for not moving for a directed verdict on the application of the Group Crime Enhancement, arguing that there was insufficient evidence that he acted in concert with two or more persons. As explained above, the evidence and reasonable inferences to be drawn therefrom were sufficient to support the application of the Group Crime Enhancement. Thus, a motion for directed verdict would have been futile, and "the failure of counsel to make motions or objections which would be futile if raised does not constitute ineffective assistance." *See State v. Whittle*, 1999 UT 96, ¶ 34, 989 P.2d 52 (quotation simplified). We therefore conclude that trial counsel did not render ineffective assistance by failing to move for a directed verdict on the application of the Group Crime Enhancement. *See State v. Johnson*, 2015 UT App 312, ¶ 16, 365 P.3d 730.

CONCLUSION

¶54 Because the eyewitnesses' identifications were sufficiently reliable under *Ramirez*, we conclude that trial counsel did not perform deficiently in declining to pursue a motion to exclude them. In addition, because there was sufficient evidence to support Defendant's aggravated robbery convictions and the

application of the Group Crime Enhancement, the trial court did not plainly err by failing to sua sponte enter a directed verdict, and trial counsel was not ineffective for failing to make a futile motion for directed verdict.

¶55    Affirmed.

————————